# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-1139

MANNIE MADDOX,

*Plaintiff-Appellant,*

*v.*

TIMOTHY LOVE, JASON GARNETT, and LEE RYKER,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 06-cv-700-JPG—**J. Phil Gilbert**, *Judge.*

ARGUED FEBRUARY 8, 2011—DECIDED AUGUST 24, 2011

Before SYKES, TINDER , and HAMILTON, *Circuit Judges.*

TINDER, *Circuit Judge.* Inmate Mannie Maddox, a member of the African Hebrew Israelite (AHI) faith since 1998, was incarcerated at Illinois Lawrence Correctional Center (Lawrence) from March 2004 to August 2007. When he arrived to serve his sentence, he no doubt was pleased to discover that an AHI minister performed religious services for AHI inmates bimonthly. Maddox regularly attended these religious services until

September 2004, when the prison announced over its television channel that AHI services were cancelled until further notice. Maddox, upset about the cancellation, filed a grievance asserting a denial of religious fellowship. Lawrence denied his grievance, explaining that the service was cancelled due to budget cuts. Maddox appealed to the Grievance Officer and then to the Department Director to no avail; they upheld the denial of his grievance on the merits. During the three stages of review, Maddox was never informed that his grievance was incomplete or procedurally deficient.

Maddox filed a pro se 42 U.S.C. § 1983 complaint against the prison chaplain, Timothy Love, and prison wardens, Jason Garnett and Lee Ryker (Ryker took over as warden in 2005), in their individual and official capacities alleging violations of his rights under the First and Fourteenth Amendments to the United States Constitution and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc. He also asserted related state law claims under the Illinois Constitution, Art. I, §§ 2 and 3. Maddox sought declaratory, injunctive, and monetary relief. In screening Maddox's complaint pursuant to 28 U.S.C. § 1915A, the district court reorganized Maddox's allegations to structure them into four separate counts, summarized as follows: Count 1—failure to provide reasonable access to religious materials; Counts 2 and 3—two manifestations of discrimination in allocation of the prison religious budget; and Count 4—failure to provide group worship services. This restructuring did not distinguish between federal and state law theories.

The district court dismissed Counts 2 and 3 for failure to state a claim at the screening stage. The defendants then moved for summary judgment on Counts 1 and 4, arguing that Maddox didn't properly exhaust his administrative remedies under the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), because he didn't indicate on his grievance form who the defendants were that violated his rights, nor did he attempt to describe them. The district court granted the defendants' motion. Maddox appeals the court's dismissal of Counts 2 and 3 and grant of summary judgment in favor of the defendants on Counts 1 and 4.

We affirm in part and reverse and vacate in part. We reverse the dismissal of Counts 2 and 3 and vacate entry of summary judgment in favor of the defendants on Count 4 with respect to Maddox's § 1983 claims against the defendants in their individual capacities. Because Lawrence processed Maddox's grievance that he was denied religious fellowship (Count 4) on the merits without rejecting it for procedural deficiencies, the grievance served its function of providing prison officials a fair opportunity to address his complaints; we therefore find that Maddox sufficiently exhausted his administrative remedies on that claim. We further find that the district court's characterization of Counts 2 and 3 was too narrow a reading of Maddox's complaint and led to premature dismissal of his claims at the screening stage. We, however, affirm the court's dismissal of Count 1 because Maddox only complained of a failure to provide religious services in his grievance, not a failure to provide religious materials, so he didn't properly exhaust that claim.

## I. Facts[1]

Maddox was an inmate at Lawrence from March 2004 until he was transferred to Danville Correctional Center in August 2007. He brings this complaint against three Lawrence employees: Defendant Jason Garnett, who was the warden from January 2004 through July 2005, Defendant Lee Ryker, who succeeded as the warden in October 2005, and Defendant Timothy Love, who has been the chaplain since the prison opened in 2001. Lawrence is a Level 2 secure-medium adult facility housing about 2,000 inmates. As of May 2009, the inmates at Lawrence had declared 46 different religious affiliations, which included 647 inmates who identified themselves as Christians, 313 as Baptists, 299 as Catholics, 119 as

---

[1] The defendants ask this court to strike portions of Maddox's brief that do not comply with Circuit Rule 28(c), which requires that "[n]o fact shall be stated in [the Statement of Facts] unless it is supported by a reference to the page or pages of the record or the appendix where that fact appears." As the defendants point out, Maddox in numerous places cites to the entire summary judgment record (or sometimes nothing at all) to support some of his factual contentions. *See Casna v. City of Loves Park*, 574 F.3d 420, 424 (7th Cir. 2009) (striking "fact" section and all portions of argument that relied on unsupported facts). Although striking Maddox's factual statements would be permissible here, because the relevant facts for purposes of this appeal are easily found within the record and are largely undisputed, we merely admonish counsel for Maddox to properly comply with Circuit Rule 28(c) in subsequent filings with this court.

Muslims, 32 as Moorish Science Temple followers, 30 as Jehovah's Witnesses, 28 as AHIs, and 5 as Jews. In 2004, the prison offered approximately 17 regularly scheduled religious services for various religions, including services for AHI inmates.

Maddox, an AHI adherent[2] since 1998, began attending AHI services when he first arrived at Lawrence. The Illinois Department of Corrections (IDOC) had a contract with an AHI minister[3] in Chicago who traveled to Lawrence (nearly a 250 mile drive) to provide service to AHI inmates. Lawrence held services bimonthly for members of the AHI religion, as well as additional services during religious holiday periods; the AHI services were supervised by Love and a security officer. The AHI minister provided inmates with religious literature and fresh fruits for religious holidays. Maddox regularly attended these services until September 2004, when he saw a message displayed on the prison's televi-

---

[2] The record doesn't provide much information about this religion and because the tenets of the religion are not important to this opinion, we don't discuss them here other than noting that it is a belief system following certain practices of Judaism. *See e.g., United States v. Washington*, 705 F.2d 489, 493 n.2 (D.C. Cir. 1983) ("The Original African Hebrew Israelite Nation of Jerusalem is a small religious group which believes that its members are descendants of the original Hebrews.").

[3] There might be some debate about whether the term "rabbi" may be more appropriate, but we use the term "minister" to conform with Maddox's deposition testimony.

sion channel that AHI services were cancelled until further notice. As Maddox later discovered, the IDOC terminated the AHI minister's contract because of budget cuts. Decisions regarding the employment of chaplains are made at the departmental level. At the time the AHI services were cancelled, the IDOC continued its contract with a rabbi from Chicago to minister to Jewish inmates in all Illinois prisons, including Lawrence.

After viewing this announcement, Maddox had two brief conversations with Warden Garnett about the cancellation of AHI services. Garnett first told Maddox there was nothing he could do and that he should talk to Chaplain Love. Garnett later told him to file a grievance. Maddox also briefly spoke with Ryker about the cancellation and Ryker told him to "talk to the person in charge of it." Despite not having religious services, Maddox still practiced his faith by receiving religious guidance from his mother over the phone and reading religious literature, including two Bibles,[4] previously provided to him by the AHI minister. He also testified that he prayed in his cell and received a religious diet.

Maddox, heeding Garnett's advice, filed a grievance dated October 29, 2004, on a 2001 form provided by the IDOC. (The date of the form is significant because in 2003, Illinois Administrative Code was amended to

---

[4] Maddox used the term "Bible" to refer to AHI's religious text; we assert no opinion on whether that is the proper terminology.

require the inmate's grievance to include the name of the individual who is the subject of or involved in the complaint. More on this later). The form requests that the inmate provide a brief summary of the grievance. Maddox filled out the form, but did not name or attempt to describe any individual involved in his complaint. He stated that on September 10, 2004, an announcement was posted on the institution's television channel that AHI Services were cancelled until further notice. He asserted denial of religious fellowship, stating "[i]n each and every religious doctrine, one of the most fundamental concepts is in the act of ministering to those in need, to educate those who seek, and to [outwardly] pray with those who so request." He asserted that his "right to freely exercise his religion [was] abrogated, limited, and rescinded"; he sought transfer to another facility or $20,000 in damages.

Three days after filing his grievance, a grievance counselor responded that "Chaplain Love was contacted and stated this service was cancelled due to budget cuts." Maddox's grievance was formally denied on January 12, 2005, by the Grievance Officer who issued a report stating that "[t]he facility cancelled the services due to budget cuts. While the facility has several volunteers to help with religious services, the leader of the African Hebrew Israelite services was being compensated." The report recommended the grievance be denied. It stated: "The facility is in compliance with DR 425.30 Accommodation of Religious Beliefs which is based in part on availability of resources." *See* 20 Ill. Admin. Code § 425.30(a) (prisoners "shall be provided reasonable

opportunities to pursue their religious beliefs and practices subject to concerns regarding . . . resources"). Garnett, as Chief Administrative Officer, concurred with the recommendation and denied the grievance. Maddox appealed to the IDOC Director who concurred with a recommendation by the IDOC Administrative Review Board Office of Inmate Issues to deny the grievance. During these three stages of review, Maddox was never informed that his grievance was incomplete or procedurally infirm in any way.

At some point, Maddox asked Love if the AHI inmates could just meet in a group with supervision; Love rejected the idea because, according to Love, there was no one who could properly supervise the meeting. Love attested that his schedule would not accommodate the addition of another service or prayer meeting, particularly for a faith that has so few members. Love spends half his time conducting or supervising services and religious study periods for Catholics, other Christians, Muslims, Moorish Science Temple followers, Jehovah's Witnesses, and Jews, as well as non-denominational events; he also monitors services conducted by volunteers to ensure that the inmates follow their pre-approved lesson plan. Love spends his remaining time making rounds to talk to inmates about their religious needs, responding to religious request slips, placing inmates on call-pass for services, delivering death notices to inmates, and enforcing prison regulations as they relate to religious services and symbols. Love's salary comprises nearly all of Lawrence's budget for religious related matters. Garnett attested that prison officials

"looked at other options for providing the services, but could not find a satisfactory solution." Love asked AHI inmates (the record is unclear whether Maddox was one) to provide him with names of outside faith representatives so he could ask them to volunteer to provide services, but they never provided him with any names.

For security reasons, the prison has required the chaplain or a religious program volunteer to conduct or supervise religious activities, which are also monitored by security staff. *See* 20 Ill. Admin. Code § 425.60(a) ("Religious activities approved by the Chief Administrative Officer shall be conducted or supervised by a chaplain or religious program volunteer."). The chaplain or religious volunteer is in a better position to recognize if the inmates deviate from their pre-approved lesson plan. For example, Love attested that "although the 119 Muslim inmates and the 32 Moorish Science Temple inmates meet without an outside faith representative, they do not meet unsupervised. I have monitored their meetings since 2001 and 2002, respectively." The prison has recently (in 2009) made exceptions to this rule on a trial basis by occasionally allowing some religious groups to meet with only security officers when the chaplain is unavailable due to vacation or illness as long as the chaplain pre-approves their lesson plan. The defendants averred, however, that the prison doesn't allow groups of inmates to meet regularly without the supervision of the chaplain. These rules are intended to reduce gang-related activity.

## II. Discussion

Before proceeding to the merits, we must pause to consider whether we have jurisdiction over this appeal. *See Baker v. Kingsley*, 387 F.3d 649, 653 (7th Cir. 2004) ("[W]e have an independent duty to determine that jurisdiction exists before we can proceed to the merits."). Under 28 U.S.C. § 1291, we have jurisdiction over "all final decisions of the district courts of the United States." A final judgment, for purposes of section 1291, is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *McMillian v. Sheraton Chi. Hotel & Towers*, 567 F.3d 839, 842 (7th Cir. 2009) (quotations omitted).

The district court dismissed Maddox's Counts 1 and 4 "without prejudice" on exhaustion grounds. A dismissal without prejudice normally "does not qualify as an appealable final judgment because the plaintiff is free to re-file the case." *Larkin v. Galloway*, 266 F.3d 718, 721 (7th Cir. 2001). But certain circumstances allow us to consider such a dismissal as final. For example, "if the plaintiff cannot cure the defects in his complaint, the dismissal in effect was with prejudice and is final for purposes of appellate review." *Barnes v. Briley,* 420 F.3d 673, 676-77 (7th Cir. 2005) (quotation omitted). There is nothing to indicate that Maddox can fix his grievances and he has no more remedies to exhaust. Accordingly, the dismissal without prejudice does not preclude our appellate jurisdiction. *See id.* at 677 (district court's dismissal of complaint without prejudice for failure to exhaust administrative remedies was final appealable

order where inmate filed grievances and pursued them to conclusion and there was no indication that Illinois would allow him to file another).

It is apparent that the district court is finished with this case. When the district court dismissed Counts 1 and 4 for failure to exhaust, it stated: "All the other matters and issues, once the Court makes the finding, the failure to exhaust the other matters, become moot and the Court cannot address those. So you will have a right to appeal this decision, Mr. Maddox, but that will be the finding and ruling of this Court." The court made the following entry: "The Court after hearing argument from parties, hereby GRANTS the Motion for Summary Judgment, finding that the plaintiff failed to exhaust all administrative remedies by failing to name[] Love, Garnett and Ryker in his grievances[.] The Court finds that all other matters are Moot, and advises the plaintiff of his appeal rights." The court then entered judgment, dismissing Counts 2 and 3 with prejudice and Counts 1 and 4 without prejudice. The court could have at that point declined to exercise supplemental jurisdiction over Maddox's state law claims, but it didn't do that. Instead, it in effect dismissed those claims as moot.[5]

---

[5] The defendants correctly point out that the district court didn't separately address Maddox's state law claims that defendants violated the Illinois Constitution. The defendants argue that the district court never had subject matter jurisdiction over Maddox's state law claims, citing to Illinois State Lawsuit Immunity Act, 745 Ill. Comp. Stat 5/0.01 *et seq.* We

(continued...)

Satisfied that our jurisdiction is secure, we move on to the merits. We can quickly dispose of several of Maddox's claims. Maddox's prayers for injunctive relief are moot because he is no longer an inmate at Lawrence. *See Ortiz v. Downey*, 561 F.3d 664, 668 (7th Cir. 2009). Maddox has not shown a realistic possibility that he will again be incarcerated in the same state facility and therefore be subject to the actions of which he complains here. As such, "[a]ny relief that our judgment might permit would be purely speculative in nature." *See id.* Further, the defendants are immune from suit under § 1983 for monetary damages in their official capacities. *See Brown v. Budz*, 398 F.3d 904, 917-18 (7th Cir. 2005) ("To the extent [the plaintiff] seeks monetary damages from defendants acting in their official capacity, those claims . . . are dismissed as they are barred by the Eleventh Amendment.").

Maddox's RLUIPA claim also fails. Sovereign immunity shields state officials from monetary damages in their official capacity under RLUIPA. *See Sossamon v. Texas,* ___ U.S. ___, 131 S. Ct. 1651, 1658-59 (2011); *see also Nelson v. Miller*, 570 F.3d 868, 884-85 (7th Cir. 2009). We have also held that RLUIPA does not allow for suits against prison officials in their individual capacity. *Nelson*, 570 F.3d at 886-89. Because Maddox has no claim

---

[5] (...continued)
don't need to address whether this immunity applies here or the mootness dismissal of the state law claims because Maddox abandoned those claims on appeal.

to injunctive relief in light of his transfer to Danville, he cannot seek relief under RLUIPA.

So that leaves us with Maddox's 1983 claims for monetary damages against the defendants in their individual capacities. It is to those claims we now turn.

### A. Section 1915A Screening—Dismissal of Counts 2 and 3

Maddox's complaint alleges that the defendants substantially burdened the free exercise of his religion as an AHI and discriminated against his religion in violation of the First and Fourteenth Amendment. (Pl. Compl., App. 1, preliminary statement). He set forth a number of factual allegations in support of his claims. He asserted that the "study of the [AHI] religion both by Plaintiff and with other [AHI] members is an integral part of the daily practice of his sincere beliefs." (*Id.* at App. 3, ¶ 14). He stated that the defendants discriminated "between Christian and [AHI] inmates by providing reasonable access to religious materials to the former and not to the latter." (*Id.* at App. 4, ¶ 17). He further stated that the defendants refused to compensate the AHI minister in the same manner as other religious leaders and allocated "a disproportionately small share of the Lawrence religious budget . . . to [AHI] activities . . . ." (*Id.* at App. 4, ¶ 18). The defendants exaggerated their response, according to Maddox, by stating that the prison lacked resources due to budget cuts when Love could have supervised their meetings since he was available and already being compensated

by the prison. (*Id.* at App. 4, ¶ 19). Maddox complains that his "right to freely exercise his religion has been infringed on by Defendants because their acts and omissions substantially diminished his qualitative spiritual experience(s) as an [AHI] at Lawrence." (*Id.* at App. 4, ¶ 20).

Maddox then set forth two counts. In his first "count," he asserted that the "[t]he restrictions and cancellation of the [AHI] services at Lawrence by the Defendants were and are arbitrarily imposed and has put a substantial burden on Plaintiff's right to freely exercise his religion" in violation of the First Amendment, RLUIPA, and Art. I, § 3 (Religious Freedom) of the Illinois Constitution. (*Id.* at App. 5, ¶ 27). In his second "count," he asserted that the defendants violated his rights under the Equal Protection Clause of the Fourteenth Amendment, RLUIPA, and Art. I, § 2 (Due Process and Equal Protection) of the Illinois Constitution "in discriminating between Christian and [AHI] inmates by both providing the former and not the latter with reasonable access to religious reading materials, and by refusing to proportionately distribute to . . . the [AHI] group at Lawrence . . . funds allocated for religious purposes, as well as by failing to compensate an outside religious leader and/or faith representatives at Lawrence." (*Id.* at App. 5, ¶ 28).

In screening Maddox's complaint pursuant to 28 U.S.C. § 1915A, the district court restructured it to assert four separate counts: Count 1: the defendants provided reasonable access to religious materials for members of Christian faiths, but not to adherents of the AHI faith;

Count 2: the defendants failed to compensate the outside leader of the AHI faith in the same manner as leaders of other religious groups; Count 3: the defendants allocated a disproportionately small portion of the available religious budget at Lawrence to the AHI faith; and Count 4: the defendants failed to permit members of the AHI faith to participate in group worship services even under the auspices of defendant Love. In the remainder of this opinion, we refer to Maddox's counts as restructured by the district court. The district court dismissed Counts 2 and 3 for failure to state a claim upon which relief can be granted. *See* 28 U.S.C. § 1915A(b). The court reasoned that the constitution doesn't require prisons to "provide each religious group or sect the exact same personnel, facilities, or other resources" or that "state resources allocated for religious activities in prisons be equally or proportionally distributed among the various religious groups." *Maddox v. Love*, No. 06-700-JPG, 2007 WL 3333251, at *3 (S.D. Ill. Nov. 9, 2007) (citing *Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972)).

We review a failure to state a claim under § 1915A in the same manner as an "ordinary 12(b)(6) dismissal," so our review is de novo. *Sanders v. Sheahan*, 198 F.3d 626, 626 (7th Cir. 1999). To satisfy the notice-pleading standard, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief," which is sufficient to provide the defendant with "fair notice" of the claim and its basis. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (quoting Fed. R. Civ. P. 8(a)(2))). Recent cases instruct us to

examine whether the allegations in the complaint state a "plausible" claim for relief. *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (to survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). The complaint "must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008) (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008)). We, however, construe pro se complaints liberally and hold them to a less stringent standard than formal pleadings drafted by lawyers. *Erickson*, 551 U.S. at 94 (citation omitted); *Obriecht v. Raemisch*, 517 F.3d 489, 491 n. 2 (7th Cir. 2008).

If the district court's restructuring and narrowing of Maddox's complaint in Counts 2 and 3 are accepted, a conclusion that these counts fail to state a claim perhaps can be understood. "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution, but prisoners' constitutional rights may be restricted by the fact of confinement and the needs of the penal institution." *Young v. Lane*, 922 F.2d 370, 374 (7th Cir. 1991) (internal quotations and citations omitted). Prisons need not provide every religious sect or group within a prison with identical facilities or per-

sonnel and need not employ chaplains representing every faith among the inmate population. *See Cruz*, 405 U.S. at 322 n. 2. "[T]he free exercise clause guarantees a liberty interest, a substantive right; it does not guarantee that all religious sects will be treated alike in all respects." *Young*, 922 F.2d at 377 (citing *Cruz*, 405 U.S. at 322 n. 2). A plaintiff doesn't state a cause of action under the First Amendment merely because a prison allocates a disproportionately smaller amount of its religious budget to certain sects or provides clergy for one religion and not another. *See id.* at 377-78 (finding no precedent that would require defendants to reimburse rabbis for their travel expenses when they constituted less than one percent of the prison population even though defendants reimbursed other clergy visiting the prison). After all, if a budget for religious-related matters were to be divided too many ways, the result could be an inadequate provision of religious access for the prisoners as a whole.

Maddox, however, urges us on appeal to read these counts more broadly in the context of his overall complaint and allegations that defendants denied AHI adherents a reasonable opportunity to pursue their faith by allocating a disproportionally small amount of the religious budget to AHI services and signaling out those services for cancellation. We agree with Maddox that his complaint should be read more broadly. The problem, as we see it, is trying to separate Maddox's claim for religious fellowship (the subject of his grievance) into separate counts (Counts 2, 3, and 4). The better approach is to examine the facts in the aggregate to

determine whether, based on the totality of the situation, the defendants "denied [Maddox] a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz*, 405 U.S. at 322; *see, e.g., Johnson-Bey v. Lane*, 863 F.2d 1308, 1312 (7th Cir. 1988) (remanding for determination whether prison officials unreasonably delayed making arrangements for Moorish ministers to visit prison and finding "troubling" that prison pays for full-time Catholic and Protestant chaplains, but would not reimburse visiting Moorish minister for travel expenses). Maddox alleges that the defendants singled out AHI services for cancellation purportedly due to budget cuts, disproportionally allocated the prison's religious budget and resources (including Chaplain Love's time) to other religions, and failed to pursue alternatives to allow the inmates to pursue their faith. These facts, as set forth in Maddox's complaint, sufficiently state a claim for relief that is plausible on its face.

Prisons must permit inmates the reasonable opportunity to exercise religious freedom. *Cruz*, 405 U.S. at 322 & n. 2. However, prison restrictions that infringe on an inmate's exercise of his religion are permissible if they are reasonably related to a legitimate penological objective, such as security and economic concerns. *See Turner v. Safley*, 482 U.S. 78, 89-91 (1987) (listing factors relevant in determining whether the "reasonableness" test has been met); *see also Al-Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir. 1991). The court must balance Maddox's right to be afforded a reasonable opportunity to exercise

the religious freedom guaranteed by the First and Four-teenth Amendments against the legitimate penological goals of the prison. *See Young,* 922 F.2d at 374. Within these confines, a prison is required to make "only rea-sonable efforts" to provide "some opportunity" for reli-gious practice. *Alston v. DeBruyn*, 13 F.3d 1036, 1040-41 (7th Cir. 1994). This test is less restrictive than that ordi-narily applied to infringements on constitutional rights in consideration of the need to give appropriate defer-ence to prison officials, avoiding unnecessary judicial intrusion into security problems and other prison con-cerns. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348-49 (1987).

"In providing this opportunity, the efforts of prison administrators, when assessed in their totality, must be evenhanded." *Al-Alamin*, 926 F.2d at 686. Prisons cannot discriminate against a particular religion "except to the extent required by the exigencies of prison administra-tion." *Johnson-Bey*, 863 F.2d at 1312. "The rights of inmates belonging to minority or non-traditional re-ligions must be respected to the same degree as the rights of those belonging to larger and more tradi-tional denominations. Of course, economic and, at times, security constraints may require that the needs of inmates adhering to one faith be accommodated dif-ferently from those adhering to another." *Al-Alamin*, 926 F.2d at 686. "[T]he treatment of all inmates must be qualitatively comparable." *Id.; see, e.g., Williams v. Lane*, 851 F.2d 867, 885 (7th Cir. 1988) (affirming trial court's determination after bench trial that defendants violated protective custody inmates' First Amendment rights

by denying them, but not general population inmates, opportunities for regular communal worship, religious instruction, and private religious counseling without legitimate penological interests).

Whether the defendants made reasonable efforts to provide Maddox some opportunity for religious practice or whether they were justified in signaling out AHI services for cancellation because of budgetary restrictions remains to be seen. It is premature to make that determination at the pleading stage. *See e.g., Ortiz v. Downey*, 561 F.3d 664, 669-70 (7th Cir. 2009) (holding that the district court's determination at the pleading stage that the prison had a legitimate penological reason to deny detainee religious articles of rosary and prayer booklet was premature); *see Alston*, 13 F.3d at 1040 (holding dismissal improper where the district court assumed that the defendants were justified in restricting the inmate's religious freedom because he was in administrative segregation). We do not make any determination about the ultimate merits of the allegations contained in the complaint, nor should our decision today be read as suggesting an outcome. We only conclude that Maddox has stated a claim "plausible on its face" that he was denied a reasonable opportunity to exercise his religion without adequate penological justification.

## B. Summary Judgment—Dismissal of Counts 1 and 4

The district court allowed Maddox's complaint to go forward on Counts 1 and 4, but then granted the defen-

dants' motion for summary judgment on both counts because Maddox failed to properly exhaust his administrative remedies. Maddox concedes that he failed to grieve his complaint for access to religious materials (Count 1), Appellant's Reply Br. p. 2 n.1 (stating that his "grievance did not address alleged denial of access to religious literature, and therefore, his claims as to this issue were properly dismissed on summary judgment"), so we find that the district court properly dismissed that count. The district court, however, also dismissed Maddox's claim for group worship (Count 4) because he failed to list the names of the defendants, or if not known at the time, their description, in the grievance pursuant to 20 Illinois Administrative Code § 504.810. We review de novo the question whether the prisoner has met the exhaustion requirement. *See Conyers v. Abitz*, 416 F.3d 580, 584 (7th Cir. 2005). Exhaustion is an affirmative defense with the burden of proof on the defendants. *See Jones v. Bock*, 549 U.S. 199, 212 (2007).

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Section 1997e(a) requires "proper exhaustion"; that is, the inmate must file a timely grievance utilizing the procedures and rules of the state's prison grievance process. *See Woodford v. Ngo*, 548 U.S. 81, 90, 93 (2006); *see also Conyers*, 416 F.3d at 584. The "applicable procedural rules" that a prisoner must properly exhaust are defined not by the PLRA, but by the prison grievance process itself. *Jones*, 549 U.S. at 218. We have taken a "strict compliance approach to

exhaustion." *Dole v. Chandler*, 438 F.3d 804, 808 (7th Cir. 2006). Thus, "[a] prisoner must properly use the prison's grievance process. If he or she fails to do so, the prison administrative authority can refuse to hear the case, and the prisoner's claim can be indefinitely unexhausted." *Id.* Grievances are intended to "[allow prisons] to address complaints about the program it administers before being subjected to suit, [reduce] litigation to the extent complaints are satisfactorily resolved, and [improve] litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219.

The Illinois Administrative Code requires that the grievance "contain factual details regarding each aspect of the offender's complaint, including what happened, when, where, and the name of each person who is the subject of or who is otherwise involved in the complaint." 20 Ill. Admin. Code § 504.810(b). If names of individuals are unknown to the offender, he can still file the grievance, but "must include as much descriptive information about the individual as possible." *Id.* This version of the Code provision became effective in 2003 and was in effect when Maddox filed his grievance. However, Maddox filed his grievance on a prison form dated 2001 and the form only asked for a "Brief Summary of Grievance"; there was no indication on the form that names had to be provided. That's because under the prior version of § 504.810, inmates were not required to draft their grievances with any specific degree of factual particularity and were not required to identify, by name or otherwise, the individuals responsible for the events that gave rise to their respective

grievances. *See* 27 Ill. Reg. § 6214 (amending § 504.810). Prior to 2003, a grievance sufficed simply by "object[ing] intelligently to some asserted shortcoming." *Cannon v. Washington*, 418 F.3d 714, 718 (7th Cir. 2005); *see also Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002) ("Illinois has not established any rule or regulation prescribing the contents of a grievance or the necessary degree of factual particularity.").

The defendants argue that Maddox failed to exhaust his administrative remedies because he did not name the defendants or describe them in his grievance; the defendants do not otherwise contend that Maddox failed to follow the prison three-step grievance process. *See* 20 Ill. Admin. Code §§ 504.800 *et seq.* (detailing grievance procedure); *see also Burrell v. Powers*, 431 F.3d 282, 284 (7th Cir. 2005) (explaining process). This argument fails because before this suit, Maddox's compliance with the grievance process was never in question. Maddox's grievance was rejected on the merits at every stage of review without any indication from prison officials that it was procedurally deficient.[6] "[A] procedural

---

[6] The defendants contend that Maddox has waived this argument on appeal by not developing it below. We disagree. First, Maddox was acting pro se in the district court, and as a pro se litigant, his submissions should be held to less exacting standards than those drafted by counsel. *See Alvardo v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001). Second, and more importantly, Maddox did respond to the defendants' summary judgment motion by contending that he exhausted available administra-

(continued...)

shortcoming like failing to follow the prison's time dead-
lines amounts to a failure to exhaust only if prison ad-
ministrators explicitly relied on that shortcoming." *Conyers*, 416 F.3d at 585. Where prison officials address
an inmate's grievance on the merits without rejecting it
on procedural grounds, the grievance has served its
function of alerting the state and inviting corrective
action, and defendants cannot rely on the failure to
exhaust defense. *See id.; see also Riccardo v. Rausch*, 375
F.3d 521, 524 (7th Cir. 2004) ("[W]hen a state treats a
filing as timely and resolves it on the merits, the federal
judiciary will not second-guess that action, for the griev-
ance has served its function of alerting the state and
inviting corrective action."); *Ford v. Johnson*, 362 F.3d 395,
398 (7th Cir. 2004) (stating that by deciding prisoner's
grievance without invoking a forfeiture doctrine, the
Administrative Review Board established that the
prisoner exhausted his state remedies).

Maddox's grievance served its function by providing
prison officials a fair opportunity to address his com-

---

[6] (...continued)

tive remedies and that he received a response to his grievance
at every level denying his request due to budget cuts. During
the summary judgment hearing, Maddox also stated that the
grievance goes to the warden and he even talked to the
warden about his grievance. He stated, "I exhausted my
remedy by filing a grievance." The defendants had the burden
to prove their affirmative defense of exhaustion and to show
that they were entitled to summary judgment on that basis.
Based on the record submitted and the undisputed facts,
they failed to make that showing.

plaint. He complained about an administrative deci-sion—the cancellation of AHI services—and it belies reason to suggest that prison administrators at Lawrence were unaware of who was responsible for that decision. In fact, defendant Love was asked to respond to Maddox's grievance and defendant Garnett, as Chief Administra-tive Officer, was directly involved in denying it. That Maddox didn't specifically name the defendants in the grievance was a mere technical defect that had no effect on the process and didn't limit the usefulness of the exhaustion requirement. *See Jones*, 549 U.S. at 219 (pro-viding early notice to those who might later be sued has not been thought to be one of the leading purposes of the exhaustion requirement) (citing *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004) ("We are mindful that the primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued; the grievance is not a summons and complaint that initiates adversarial litigation.")).

This conclusion is particularly appropriate in this case where the form provided by the prison didn't request inmates to provide the name of the person subject to the complaint. *See, e.g., Curtis v. Timberlake*, 436 F.3d 709, 712 (7th Cir. 2005) (reversing summary judgment in favor of defendant on exhaustion grounds where prisoner presented evidence that he followed the prison's "accepted practice" with regard to submitting grievances even though he didn't follow the letter of the written grievance procedure). The grievance form pro-vided to Maddox asked for a brief summary of the griev-

ance; Maddox provided a brief summary. He was never informed that his summary was procedurally deficient, and prison officials (including defendant Garnett) acted on his grievance by addressing it on the merits after contacting defendant Love to respond. Based on these facts, we find that Maddox properly exhausted his administrative remedies.

We therefore reverse the district court's entry of summary judgment in favor of the defendants on Count 4 and remand for further consideration. The defendants addressed the merits of Count 4 in their memorandum in support of summary judgment and raised the defense of qualified immunity, but the district court didn't address those issues, nor has either party addressed them on appeal. We therefore remand to the district court to consider the plaintiffs' claims on the merits in the first instance. *See, e.g., Johnson v. Hix Wrecker Serv., Inc.*, ___ F.3d ___, No. 09-3023, 2011 WL 2586284, at *4 (7th Cir. July 1, 2011) (declining to address issue raised on summary judgment that the district court hadn't first considered); *see also Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 916-17 (7th Cir. 2011) (remanding to the district court the issue of whether the defendants are entitled to summary judgment on the basis of qualified immunity).

## III.  Conclusion

For the foregoing reasons, we REVERSE the dismissal of Counts 2 and 3 and VACATE the entry of summary judgment in favor of the defendants on Count 4 as to Maddox's

§ 1983 claims against the defendants in their individual capacities and otherwise AFFIRM. The case is REMANDED for further proceedings.