In the

# United States Court of Appeals

## For the Seventh Circuit

––––––––––––––

No. 23-1346

RAYNARD R. JACKSON,

*Plaintiff-Appellant,*

*v.*

DANE ESSER,

*Defendant-Appellee.*

––––––––––––––

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:18-cv-00237 — **William M. Conley**, *Judge.*

––––––––––––––

ARGUED NOVEMBER 3, 2023 — DECIDED JUNE 26, 2024

––––––––––––––

Before KIRSCH, JACKSON-AKIWUMI, and PRYOR, *Circuit Judges.*

KIRSCH, *Circuit Judge.* Raynard Jackson, a prisoner at the Wisconsin Secure Program Facility (WSPF), was placed in a cell without running water for five days. He alleged that Lieutenant Dane Esser, among other WSPF staff, knew that he did not have water and yet failed to turn the water on. After Jackson showed another staff member that he did not have water, the water was promptly turned on; however, he claimed Lt.

Esser and other WSPF staff failed to provide him with medical care for his dehydration. Jackson filed grievances pertaining to these issues. But while he claims he filed ten grievances, the prison processed only five. After he exhausted his administrative remedies within the WSPF, he sued Lt. Esser and other WSPF staff under 42 U.S.C. § 1983 for violating his Eighth and Fourteenth Amendment rights. The district court, only considering the processed grievances, and without holding an evidentiary hearing, found that Jackson had not exhausted his administrative remedies as to certain claims and defendants. Additional defendants, Nurse Beth Edge and Captain Dale Flannery, were dismissed at summary judgment, leaving only the claims against Lt. Esser for trial. The jury found for Lt. Esser on both claims.

Jackson raises several challenges to the district court's pretrial and trial rulings and the jury's verdict. We agree with him that the district court should not have disregarded his allegedly unprocessed grievances without holding an evidentiary hearing in line with *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008), to resolve the disputed facts around his purported filing of those grievances. But we find no error in the court's conclusion that Jackson's processed grievances did not exhaust remedies as to all his claims. There was also no error in either the court's grant of summary judgment to Nurse Edge or its evidentiary rulings before trial. And Jackson cannot challenge the sufficiency of the evidence supporting the verdict because he failed to move for judgment as a matter of law or for a new trial in the district court. Accordingly, we affirm in part, reverse in part, and remand for a *Pavey* hearing on the allegedly unprocessed grievances.

I

A

The prison where Raynard Jackson was incarcerated, the WSPF, has measures in place for prisoners who, like Jackson, have suicidal ideations. If a prisoner is at risk of self-harm or expresses that he may harm himself, he is removed from his regular cell, placed in an observation cell, and put on clinical observation status. The observation cells have one clear wall, enabling the regular monitoring of each prisoner by security staff every 15 minutes and by medical staff twice per day. The cells also have intercoms to enable prisoners to reach guards in a control room and cameras providing guards a live feed. Clinical observation status involves restrictions, including "styro meals-no spoon," which prevents a prisoner from re-ceiving any plastic utensils, cups, or trays when he is given meals—meaning he does not get beverages with meals.

When the risk of self-harm has subsided, and a prisoner is released from observation status, the restrictions are lifted, and he is taken back to a regular cell. If a prisoner refuses to return to a regular cell, prison staff may forcibly remove him from the observation cell—an "extraction"—but extractions pose risks to staff and the prisoner. To mitigate these risks, it is standard protocol at the WSPF to turn off the water in an observation cell before an extraction, but only in some cases will staff use incapacitating agents similar to pepper spray. Staff are supposed to turn the water back on and clean the cell before another prisoner is placed in the cell.

B

On the night of May 22, 2013, Jackson notified a guard at the WSPF, Sergeant Daniel Suthers, that he was experiencing

suicidal ideation. Not long after, other staff members—Captain James Boisen and Correctional Officers Michael Cockcroft and Timothy Jones—placed Jackson in observation cell A404. Five days before Jackson's placement in A404, staff had extracted the previous occupant after he experienced a mental breakdown and smeared his feces around the cell. They had turned off the water to the cell to facilitate the extraction. Jackson testified that, upon entering the cell, he observed and smelled feces and could also smell the remnants of incapacitating agents. He claimed he then discovered, after trying to wash his hands in the sink and flush the toilet, that the water was not running.

The parties vigorously dispute what took place from May 22 to 27. Jackson asserts that, upon discovering the water was off, he immediately notified the guards and asked that the water be turned on, but they did nothing. He also stresses that, on May 24, he told the shift commander, Lieutenant Dane Esser, who had been absent from the WSPF on May 22 and 23, that he did not have water, and Esser rebuffed him. All the while, he was on the styro meals-no spoon restriction that prevented him from getting beverages with his meals. By contrast, Lt. Esser maintains that Jackson told neither him, nor any of the staff members making observation rounds (including Sgt. Suthers and Officers Cockroft and Jones on May 22 and 23), that he did not have water. Moreover, Lt. Esser alleges that Jackson was released from observation status on May 24, thereby lifting the styro meals-no spoon restriction, but Jackson refused to leave the cell. That same day, both Doctor Stacey Hoem and Nurse Beth Edge checked in on Jackson. He asserts that he told them that he had no running water, but each testified to the contrary.

On May 27, in response to Jackson's complaints to security staff that he was experiencing chest pain, Nurse Edge went to his observation cell. Jackson testified that Nurse Edge initially only asked about his chest pains—she claimed she did not see him exhibiting signs of dehydration—until he yelled at her that he had no running water and showed her that no water was coming out of his sink. Nurse Edge then called a guard and told him to get Lt. Esser. Once Lt. Esser arrived, he radioed the control room and had the water immediately turned on. After the water was turned on, Jackson began drinking. Nurse Edge told Jackson to drink slowly and that she should examine him, but she provided no further treatment. Jackson contends that he sought to be examined and treated by Nurse Edge but that Lt. Esser would not allow him to leave his cell. Lt. Esser disputes this, claiming that Jackson refused examination and treatment.

## C

Once he returned to his regular cell, Jackson began filing prisoner grievances about his time in observation. The prison processed five grievances. These processed grievances raised several issues: (1) WSPF-2013-10448, filed May 29, noted that "Lt. Dane Esser had an obligation to [p]ut my water back after he was notified on several occasions to do so"; (2) WSPF-2013-10449, also filed May 29, claimed that "Edge refused to treat my severe dehydration"; (3) WSPF-2013-10776, filed June 3, asserted that "Capt Flannery & Sgt Sutters denied me medical attention on 5/27/13"; (4) WSPF-2013-10778, also filed June 3, alleged that "Edge & c/o Runice attempted to obtain my labs for severe dehydration from 5/22/13–5/27/13 when she knows she was suppose[d] to take my labs on 5/27/13 … but she failed to do so then"; and (5) WSPF-2013-1128, filed June 10,

claimed that "Esser jeopardized my personal health & safety for '3' of the '5' consecutive days my water was off in cell Alpha-404 denying me medical attention."

Jackson contends that he filed five other grievances that the WSPF failed to process. According to Jackson, those grievances contained allegations that: (1) Dr. Hoem, Capt. Boisen, Sgt. Suthers, Lt. Esser, Nurse Edge, and Officers Cockroft and Jones deprived him of humane conditions due to the presence of feces and incapacitating agents in his cell, as well as the lack of water; (2) Cockroft, Jones, and Edge denied him his nasal spray and inhaler while he was in the contaminated cell; (3) Esser ignored his complaints about the cell conditions; (4) Capt. Flannery failed to get him medical attention for his dehydration and chest pains caused by the feces and incapacitating agents in the cell; and (5) Hoem, Boisen, Suthers, Cockroft, Jones, Esser, and Edge singled him out by depriving him of basic humane conditions, access to water, and access to medical care.

D

Jackson filed suit, pro se, against 15 WSPF employees. After the district court screened Jackson's complaint under 28 U.S.C. § 1915A, he was allowed to proceed on the following claims: (1) Eighth Amendment conditions of confinement claims against Dr. Hoem, Nurse Edge, Lt. Esser, Sgt. Suthers, Capt. Boisen, and Officers Cockroft and Jones regarding the lack of running water and the presence of incapacitating agents and feces in his cell; (2) Eighth Amendment medical care deliberate indifference claims against Esser, Edge, Cockroft, and Jones for failing to provide him with nasal spray and his inhaler; (3) Eighth Amendment medical care deliberate indifference claims against Esser, Capt. Flannery, and Edge for

refusing him medical care for his dehydration; and (4) Four-teenth Amendment equal protection class-of-one claims against Hoem, Esser, Edge, Suthers, Boisen, Cockroft, and Jones.

The defendants then moved for partial summary judgment on the grounds that Jackson had failed to exhaust his administrative remedies as required by the Prisoner Litigation Reform Act (PLRA), 42 U.S.C. § 1997e. The district court granted the motion in part and denied it in part. Looking only at the processed grievances, the court found that Jackson failed to raise either the presence of feces and incapacitating agents in the cell or the denial of the inhaler and nasal spray. It then observed that Jackson's grievances never conveyed that any other WSPF staff member besides Lt. Esser singled him out for mistreatment by not turning on the water in his cell. Similarly, the court concluded that Jackson's grievances did not suggest that any defendant other than Lt. Esser was aware that he lacked running water. It also quickly dispensed with Jackson's argument that administrative remedies were unavailable.

After the court's exhaustion determination, Dr. Hoem, Sgt. Suthers, Capt. Boisen, and Officers Cockroft and Jones were dismissed from the case, leaving the following claims: (1) an Eighth Amendment conditions of confinement claim against Lt. Esser concerning the lack of running water; (2) Eighth Amendment medical care deliberate indifference claims against Esser, Capt. Flannery, and Nurse Edge for denying him care for his dehydration; and (3) a Fourteenth Amendment equal protection class-of-one claim against Esser.

Nurse Edge and Capt. Flannery then moved for summary judgment on the merits of the medical care deliberate

indifference claim, which the court granted. As to Nurse Edge, the court found that Jackson refused to leave his cell and receive treatment from her. It concluded, based on that finding, that Nurse Edge could not have been deliberately indifferent. The court also determined that Capt. Flannery was not deliberately indifferent because he did not consciously disregard Jackson's need for medical treatment, given the limited information about Jackson's condition he had at the time.

The case proceeded to trial on the claims against Lt. Esser. Before trial, and as relevant to this appeal, Jackson moved to admit: (1) evidence of a previous lawsuit against Lt. Esser involving the failure to turn another prisoner's water on after an extraction; and (2) evidence that Esser had used racist language against him. He also moved to exclude evidence that he had engaged in hunger strikes at the WSPF. The district court denied the motions to admit the evidence of the previous suit and of the use of racist language. And it ruled that evidence of Jackson's hunger strike was admissible to show Jackson knew how to obtain action from staff by denying himself sustenance.

After a three-day trial, the jury found for Lt. Esser, concluding that he did not violate Jackson's Eighth or Fourteenth Amendment rights. Jackson now appeals.

II

Jackson first challenges the district court's exhaustion determination. We review rulings that a prisoner failed to exhaust his administrative remedies de novo. *Ebmeyer v. Brock*, 11 F.4th 537, 542 (7th Cir. 2021). In doing so, we draw all reasonable inferences in the light most favorable to the nonmovant. *Kaba v. Stepp*, 458 F.3d 678, 681 (7th Cir. 2006).

The PLRA bars prisoners from suing in federal court to challenge prison conditions "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). But the PLRA does not define the requirements for exhaustion; for state prisoners, state law establishes the relevant administrative remedies. *Schillinger v. Kiley*, 954 F.3d 990, 995 (7th Cir. 2020). As the WSPF is a Wisconsin prison, we look to the grievance procedures under Wisconsin law. *Id.* We require strict adherence to these procedures: prisoners must take each step required by a state's administrative rules governing the prison grievance process. *Williams v. Rajoli*, 44 F.4th 1041, 1045 (7th Cir. 2022). Still, failure to exhaust is an affirmative defense for which defendants bear the burden of proof. *Id.*

It is undisputed that Jackson exhausted his administrative remedies as to the claims covered by his five processed grievances, though he contests the court's determination of which claims his processed grievances exhausted. There is also a question of what the court should have done in light of his allegation that WSPF officials failed to process five other grievances. Jackson claims the district court erred by concluding that the grievance process was available to him because the court failed to consider his unprocessed grievances. We first address the issue of the unprocessed grievances, then turn to that of the processed grievances.

A

Prisoners need only exhaust "available remedies, not remedies that are unavailable." *Hacker v. Dart*, 62 F.4th 1073, 1078 (7th Cir. 2023). If administrative remedies are genuinely unavailable or nonexistent because, for example, prison employees failed to respond to properly filed grievances, we consider

the prisoner to have satisfied the exhaustion requirement. *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016).

Whether a remedy (or the grievance process to access such a remedy) is available requires a "fact-specific inquiry." *Lanaghan v. Koch*, 902 F.3d 683, 688 (7th Cir. 2018) (quotation omitted). A court, faced with an allegation that remedies were unavailable, may still grant summary judgment on exhaustion grounds if it determines that there are no genuine disputes of material fact, and, viewing the facts in the light most favorable to the nonmovant, the defendants satisfied their burden to show that remedies were available to the nonmovant as a matter of law. *Smallwood v. Williams*, 59 F.4th 306, 318 (7th Cir. 2023). If, however, a prisoner raises "sufficient factual allegations demonstrating a genuine dispute as to whether the administrative remedies were available to him," a court must conduct an evidentiary hearing pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008), to resolve the dispute. *Smallwood*, 59 F.4th at 318; see also *Wagoner v. Lemmon*, 778 F.3d 586, 588 (7th Cir. 2015) ("Often exhaustion (or its lack) will be apparent, but when it is not, the district court must hold an evidentiary hearing to resolve the question."). Such factual disputes can arise even when the prison denies that any grievance was filed, and the prisoner provides "no documentation to back up his claim" that he filed a grievance because a "swearing contest requires an evidentiary hearing to resolve." *Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014); see also *Ingram v. Watson*, 67 F.4th 866, 871 (7th Cir. 2023) (A court "cannot disbelieve statements in affidavits without holding a hearing."). To that end, at a *Pavey* hearing, the court may take evidence and determine credibility before rendering the factual findings that settle the swearing contest. *Wilborn v. Ealey*, 881 F.3d 998, 1004 (7th Cir. 2018).

Jackson, though not in the clearest terms, pointed to evidence suggesting that the prison unjustifiably failed to process all of his grievances. This raised a genuine dispute about whether administrative remedies were unavailable for the issues raised in those grievances.

The defendants maintain that Jackson filed only five relevant grievances, which were all processed. On the other hand, Jackson attested that, upon returning to his cell on May 27, he filed five grievances, waited, did not receive any receipt that they had been processed, and then sought to verify that they had been processed. His declaration and summary judgment brief described the allegations in those unprocessed grievances, which covered different issues from those raised in the processed grievances.

Jackson also supports his testimony with documentation. He attached to his declaration an information request to the WSPF official who managed the grievance process and a message to another official about the unprocessed grievances. In the information request, dated June 4, he stated:

> Confiscating my "5" complaints & refusing to process them are you serious??? … you better read DOC 310.09(2) & the specific issues in my complaints you have no choice but to process em that 2 complaints doesn't mean a thing when Lt. Esser endangered my health & safety per DOC 310.09(2) process my complaints there's no getting around this! … don't become a defendant!!! For leaving me in a shitty cell w/ chemical agents w/ no water for days!!!

The reference to "'5' complaints" could be taken to refer to the five processed grievances filed May 29, June 3, and June 10.

But that timing does not work: the request predates the filing of the fifth grievance. And "2 complaints" might refer to the two grievances filed on May 29 that were processed by June 4 (WSPF-2013-10448 and WSPF-2013-10449), unlike the five others he claims he filed around the same time. Moreover, the WSPF official's response to Jackson's request was that his "complaint is not regarding an immediate health/safety issue." This response could suggest that the official considered Jackson's grievance in the request itself to not concern such an issue. It could also indicate that the official decided not to process Jackson's grievances because they exceeded the limit under Wisconsin regulations at that time restricting prisoners to two grievances per week unless they raise "health and personal safety issues." Wis. Admin. Code DOC § 310.09 (2002). This may have been a legitimate reason for the official to refuse to process the grievances. But, in the absence of the factual findings and credibility determinations the court would have made in a *Pavey* hearing on whether Jackson filed these grievances and did so properly, we lack sufficient facts to determine whether it was proper.

Given that Jackson's filings in the district court were unclear, the judge understandably disregarded this evidence, but doing so and thereby finding failure to exhaust without holding a *Pavey* hearing was error. The court noted that Jackson provided "no evidence" of the substance of his unprocessed grievances or that he properly filed such grievances. But Jackson did offer such evidence, and this evidence was adequate to raise a dispute of material fact. For the district court to have found for the prison officials without first holding a *Pavey* hearing, the prison officials needed to "do more than point to a lack of evidence in the record; rather they must 'establish affirmatively' that the evidence is so one-sided that

no reasonable factfinder could find that [the prisoner] was prevented from exhausting his administrative remedies." *Smallwood*, 59 F.4th at 319 ("[P]rison employees bear the burden on exhaustion.") (quotation omitted). The evidence here was not so one-sided: Jackson provided testimony and documentation indicating that WSPF failed to process his grievances. And, without a *Pavey* hearing, where the court could evaluate Jackson's and any WSPF official's credibility, the court could not ignore that evidence to find no dispute of material fact that administrative remedies were available to Jackson.

The defendants' inability to meet their burden to show that there was no dispute of material fact made it improper for the court to grant summary judgment on exhaustion grounds without a *Pavey* hearing as to Jackson's claims: (1) regarding feces and incapacitating agents; (2) that Nurse Edge and Officers Cockroft and Jones failed to provide his inhaler and nasal spray; (3) concerning denial of water by Dr. Hoem, Capt. Boisen, Sgt. Suthers, Edge, Cockroft, and Jones; and (4) that Hoem, Boisen, Suthers, Cockroft, Jones, and Edge singled him out in violation of the Fourteenth Amendment. On remand, the court should hold a *Pavey* hearing to determine whether Jackson filed the allegedly unprocessed grievances and, if he did, whether WSPF officials failed to process them without good reason under Wisconsin law. In the event that it finds that he exhausted his remedies as to these claims, we trust the district court to proceed as appropriate from there. We have not been asked to, nor do we, express any opinion on the merits of any of these claims.

B

We now turn to the processed grievances. The PLRA exhaustion requirement ensures that "a prison has received notice of, and an opportunity to correct, a problem" before being drawn into litigation. *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013). Accordingly, assuming a prisoner takes all the administrative steps, his "complaint will suffice for exhaustion purposes if it provides notice to the prison of 'the nature of the wrong for which redress is sought.'" *Schillinger*, 954 F.3d at 995 (quotation omitted). The district court had to address whether the grievances gave the WSPF sufficient notice of the issues on which Jackson based his claims, or, in other words, whether the grievances provided "prison officials a fair opportunity to address his complaint." *Maddox v. Love*, 655 F.3d 709, 722 (7th Cir. 2011).

Jackson contends that the district court improperly concluded that his processed grievances did not provide adequate notice of, and thus did not exhaust remedies as to, his: (1) Eighth Amendment conditions of confinement claims about the presence of feces and incapacitating agents in his cell; (2) Eighth Amendment medical care deliberate indifference claims based on the failure to provide him with an inhaler and nasal spray; (3) Fourteenth Amendment class-of-one claims as to all defendants other than Lt. Esser; and (4) Eighth Amendment conditions of confinement claims against Dr. Hoem, Capt. Boisen, Sgt. Suthers, Nurse Edge, and Officers Cockroft and Jones premised on the denial of running water.

1

Jackson's processed grievances did not provide adequate notice of either the presence of feces and incapacitating agents in the cell or the denial of his inhaler and nasal spray. Nowhere in his processed grievances does Jackson mention that there were feces in his cell. Though he does mention in the "brief summary" section of grievance WSPF-2013-10448 that "[o]n 5/17/13 Capt. Brown erroneously utilized chemical-agents on [redacted] who was contra-indicated," he does not indicate where those agents were used or that they remained as a contaminant in cell A404. Moreover, the "specific issue" raised in that grievance was not that there were incapacitating agents in the cell but that Lt. Esser failed to turn Jackson's water on after being notified that it was off. This grievance suggested that the "nature of the wrong for which redress is sought" was the lack of water, not the presence of incapacitating agents in the cell. *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002).

Similarly, though Jackson complained that he was denied medical attention in three grievances (WSPF-2013-10449, WSPF-2013-10776, and WSPF-2013-10778), each dealt with a denial of medical attention for his dehydration, not for asthma or other conditions that would require nasal spray or an inhaler. A claim that he was denied these items depends on different facts than does a claim that he was denied water and thus required a distinct grievance. See *Turley*, 729 F.3d at 650 ("Separate complaints about particular incidents are only required if the underlying facts or the complaints are different."). Thus, the district court did not err in finding that his grievances did not exhaust his remedies as to his claims

concerning the presence of feces and incapacitating agents
and the denial of his inhaler and nasal spray.

2

Jackson also argues that, by dismissing defendants not
named in his processed grievances, the district court erred by
effectively requiring him to specifically name every potential
defendant in his grievances. Indeed, our notice-based exhaus-
tion standard has no such requirement. *Maddox*, 655 F.3d at
722; see also *Jones v. Bock*, 549 U.S. 199, 217 (2007) ("[N]othing
in the [PLRA] imposes a 'name all defendants' require-
ment."). That said, in line with the purpose of the PLRA—to
give a prison an opportunity to correct a problem before liti-
gation, *Schillinger*, 954 F.3d at 996—prisoners must provide
"some identifying information about the accused individu-
als," *King v. Dart*, 63 F.4th 602, 609 (7th Cir. 2023). In other
words, a grievance must contain enough information about
who caused the grieved of problem so that a prison can
properly "investigate and resolve grievances." Cf. *Williams v.
Wexford Health Sources, Inc.*, 957 F.3d 828, 834 (7th Cir. 2020).
Indeed, we have found exhaustion as to defendants not
named in a grievance when, from the content of the grievance
and the nature of the complained of conduct the prison was
clearly on notice that those unnamed defendants were in-
volved. *Maddox*, 655 F.3d at 722.

In the two grievances (WSPF-2013-10448 and WSPF-2013-
1128) concerning water, Jackson identified the problem as a
failure to turn the water on despite him giving notice of the
need to do so. WSPF-2013-10448 stated that "Capt. Brown had
the water in Cell A 404 shut off & never turned back on & I
was placed in observation status on 5/22/13 until 5/28/13 with-
out water," and named as the specific issue: "Lt. Dane Esser

had an obligation to [p]ut my water back after he was notified on several occasions to do so." WSPF-2013-1128 similarly alleged, "Lt. Dane Esser after being informed for '3' days that my water was off for '5' consecutive days denying me medical-attention, jeopardizing my health & safety in the process of trying to cover up this [illegible]," and identified as the specific issue: "Lt. Esser jeopardized my personal health & safety for '3' of the '5' consecutive days my water was off in cell Alpha-404 denying me medical attention on a handheld camera by c/o Runice on 5/27/13 while I was on 'clinical observation.'"

The issue is thus whether Jackson's grievances put the WSPF on sufficient notice that Dr. Hoem, Capt. Boisen, Sgt. Suthers, Nurse Edge, and Officers Cockroft and Jones were involved in the narrow problem he identified: Lt. Esser refusing to turn Jackson's water on after Jackson told him that it was off. The district court remarked that the grievances did not indicate that any WSPF staff member other than Lt. Esser had a role in singling Jackson out by depriving him of running water. Similarly, it found that the grievances did not alert WSPF officials to the need to investigate "a broader, far reaching problem" of indifference to Jackson's lack of water because his grievances did not suggest that any other WSPF staff member besides Lt. Esser knew he had no running water.

We agree with the district court. Jackson's grievances presented one "clearly identif[ied]" issue, Wis. Admin. Code DOC § 310.09 (2002), which is that Lt. Esser refused to turn Jackson's water on after learning that Jackson did not have it. In other words, the prison was put on notice that Lt. Esser was deliberately indifferent to Jackson by ignoring his request to turn back on the water in his cell. In this lawsuit, however, Jackson's claim is now much broader. He alleges that a swath

of people—Dr. Hoem, Nurse Edge, Lt. Esser, Sgt. Suthers, Capt. Boisen, and Officers Cockroft and Jones—were deliberately indifferent to his lack of running water. In other words, "the allegation[s] in his grievance[s] … [are] substantively distinct from the allegation[s] in his federal complaint." *Bowers v. Dart*, 1 F.4th 513, 517 (7th Cir. 2021). Jackson, therefore, has not exhausted his administrative remedies for his Eighth Amendment and Fourteenth Amendment claims premised on the lack of water against defendants other than Lt. Esser. See *Schillinger*, 954 F.3d at 996 (finding failure to exhaust when the prisoner's grievance "raised two entirely different problems" from the issue in his suit).

*        *        *

In sum, the district court properly evaluated Jackson's processed grievances to find that they did not exhaust remedies as to his: (1) Eighth Amendment conditions of confinement claims based on the presence of feces and incapacitating agents in the observation cell; and (2) Eighth Amendment medical care deliberate indifference claims premised on the denial of Jackson's inhaler and nasal spray. It also correctly concluded the grievances did not exhaust remedies as to any of his claims against Dr. Hoem, Capt. Boisen, Sgt. Suthers, and Officers Cockroft and Jones because they did not provide notice of those parties' involvement in the alleged improper conduct. Similarly, the court was right to dismiss the Fourteenth Amendment claim and Eighth Amendment conditions of confinement claim based on denial of water against Nurse Edge given her lack of involvement. Accordingly, we agree with the district court that the processed grievances only exhausted Jackson's remedies as to his: (1) Eighth Amendment medical care deliberate indifference claims against Nurse

Edge, Capt. Flannery, and Lt. Esser based on the denial of medical care for dehydration; (2) Eighth Amendment conditions of confinement claim against Esser based on the lack of water; and (3) Fourteenth Amendment class-of-one claim against Esser.

## III

Jackson next insists that the district court erred by granting summary judgment to Nurse Edge on his Eighth Amendment medical care deliberate indifference claim alleging that she failed to provide him medical care for dehydration. We review this grant of summary judgment de novo, construing all facts and reasonable inferences in Jackson's favor. *Daugherty v. Page*, 906 F.3d 606, 609 (7th Cir. 2018).

The Eighth Amendment requires prisons to provide adequate medical care to prisoners. *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). Prison officials violate the Eighth Amendment if they are deliberately indifferent towards a prisoner's objectively serious medical need. *Id.* Thus, to succeed on his claim against Nurse Edge, Jackson had to show: (1) he suffered from an objectively serious medical condition; and (2) Edge was deliberately indifferent to that condition. *Id.* Deliberate indifference is a subjective standard that is met if a defendant either "knows of and disregards an excessive risk to inmate health or safety" or "is both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he draws the inference." *Id.* at 824–25 (quotation omitted).

Mere negligence will not suffice, and deliberate indifference is not coextensive with medical malpractice. *Id.* at 825; *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th

Cir. 2021) ("[D]eliberate indifference 'requires more than neg-
ligence or even gross negligence.'") (quotation omitted). Even
"objective recklessness—failing to act in the face of an unjus-
tifiably high risk that is so obvious that it should be known—
is insufficient to make out a claim." *White v. Woods*, 48 F.4th
853, 862 (7th Cir. 2022) (quotation omitted). Instead, "a pris-
oner must demonstrate that the medical professional's re-
sponse was 'so inadequate that it demonstrated an absence of
professional judgment.'" *Id.* (quotation omitted). In other
words, to show that Nurse Edge was deliberately indifferent,
Jackson must demonstrate that "no minimally competent pro-
fessional" would have acted as she did. *Arce v. Wexford Health
Sources Inc.*, 75 F.4th 673, 681 (7th Cir. 2023) (quotation omit-
ted).

Jackson argues that the district court was wrong to con-
clude that he refused treatment and, because he did not re-
fuse, that Nurse Edge was deliberately indifferent by alto-
gether failing to treat him. See *Brown v. Osmundson*, 38 F.4th
545, 550 (7th Cir. 2022) (noting "denial of medical treatment
altogether" as one of several circumstances permitting a jury
to reasonably infer deliberate indifference). We agree with
Jackson that, given the genuine dispute of material fact, the
district court should not have found that he refused treat-
ment. That said, we need not parse the issue because Jackson
has not satisfied the high bar to demonstrate that Nurse Edge
was deliberately indifferent.

Because Jackson does not show that Nurse Edge's treat-
ment of him was outside of what a minimally competent
nurse in her position would have done, no jury could con-
clude that she was deliberately indifferent. We must consider
"what risk [Edge] knew of and whether the course of

treatment was so far afield as to allow a jury to infer deliberate indifference." *Duckworth v. Ahmad*, 532 F.3d 675, 680 (7th Cir. 2008). When she came to Jackson's cell, she knew he had complained of chest pains and, soon after arriving, became aware that he had been without running water. She was able to visually assess Jackson and quickly acted to have his water turned on. Once the water was on, she told him not to drink it too quickly and said she needed to examine him but did not do any further examination. Jackson disputed that Nurse Edge did not observe any signs that he was suffering from mild, moderate, or severe dehydration but did not dispute that treatment for mild dehydration is fluids.

Jackson failed to raise a genuine dispute that Nurse Edge's visual assessment of his condition, alone, was grossly and patently inadequate to determine his level of dehydration. Thus, he cannot show that she was deliberately indifferent in not conducting a physical examination or providing treatment beyond having him drink water. Jackson admits that he acted confrontationally and yelled at Nurse Edge about his lack of water. So, in visually assessing him, she may not have perceived his dehydration to be particularly serious in light of his energy level and thereby concluded that he only needed treatment for mild dehydration. Jackson did not muster enough evidence to raise a genuine dispute that any minimally competent nurse in Nurse Edge's position would have performed a physical examination to diagnose the degree of his dehydration. Accordingly, it was not deliberately indifferent for Nurse Edge, based only on her visual assessment, to limit her treatment to ensuring that Jackson got water—the treatment for mild dehydration—and advising him to drink slowly. Jackson's contentions that she could have done more, or that it was negligent or reckless for her to yield to Lt. Esser and not

pursue further treatment (though we make no finding as to whether he did) are insufficient to show deliberate indifference. Therefore, the district court did not err in granting summary judgment for Nurse Edge on Jackson's medical care deliberate indifference claim.

## IV

We now turn to the challenged evidentiary rulings at trial. Jackson argues that the district court erred in three rulings: (1) excluding evidence of a lawsuit filed by a prisoner against Lt. Esser alleging that Esser failed to turn the prisoner's water on; (2) excluding evidence that Lt. Esser had used racist language against him; and (3) admitting evidence that he had engaged in hunger strikes at the WSPF. We review evidentiary rulings for abuse of discretion. *Green v. Junious*, 937 F.3d 1009, 1013 (7th Cir. 2019). But we will not reverse unless the error likely affected the outcome of the trial. *Id.*

## A

Evidence of the prior lawsuit against Lt. Esser is evidence of "other crime[s], wrong[s], or act[s]" subject to Federal Rule of Evidence 404(b). Such other-act evidence is inadmissible if offered for a propensity purpose: "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But it is "admissible for another purpose," like proving motive or absence of mistake. Fed. R. Evid. 404(b)(2). And because it is susceptible to use for multiple purposes, prohibited and permissible, we only admit it when it is relevant to another purpose "without relying on a propensity inference." *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014).

In excluding evidence of the prior lawsuit against Lt. Esser as prohibited other-act evidence under Rule 404(b), the district court rightly found that Esser's alleged conduct in that suit was dissimilar to his alleged conduct here. In the prior suit, Lt. Esser had the water shut off to a prisoner's cell to facilitate a cell entry to remove excess property and then failed to have the water turned back on. *Lindsey v. Esser*, No. 14-cv-357, 2015 WL 5032659, at *1 (W.D. Wis. Aug. 25, 2015). Though lacking running water, the prisoner did receive beverages with meals. *Id.* The prisoner also never alerted anyone to the problem until several days after the water had been turned off, and there was no evidence that Lt. Esser's failure to turn the water on was not a mistake. *Id.* at *1, 5–6.

That said, the district court excluded this evidence due to the dissimilarity after applying the four-part test for the admissibility of other-act evidence we eschewed in *United States v. Gomez*, 763 F.3d 845, 850, 853 (7th Cir. 2014). A decision that rests on an error of law usually constitutes an abuse of discretion. *United States v. Simon*, 727 F.3d 682, 696 (7th Cir. 2013). Here, however, there was no abuse of discretion because the district court's application of the four-part test and decision to exclude evidence of the suit was consistent with the approach in *Gomez*. Cf. *Burton v. City of Zion*, 901 F.3d 772, 779 (7th Cir. 2018). We have stressed that *Gomez* requires judges to look "more generally to the Federal Rules of Evidence." *Id.* Sometimes, elements that formed part of the four-part test, such as the similarity of the prior act, "will be relevant to the inquiry and sometimes they will not. If they are not, then a court may not reject the evidence based on a lack of similarity or recency." *Id.*

The dissimilarity of Lt. Esser's conduct was relevant here—it indicated that evidence of his conduct was not admissible other-act evidence—so the district court's focus on it to justify excluding evidence of the prior suit did not contravene *Gomez*. Jackson argues that the purpose of this evidence would be to show that the water was intentionally kept off and that Lt. Esser has a history or modus operandi of withholding water from disfavored prisoners. But given the dissimilarity of Lt. Esser's conduct in the prior suit, this evidence is not relevant to those purposes. Rather, its relevance depends on a propensity inference, requiring exclusion under Rule 404. See *Gomez*, 763 F.3d at 854 ("[T]he prior bad act may be too dissimilar to be relevant to show a distinctive pattern, leaving only the forbidden propensity inference."). Namely, its relevance relies on the following inference: Lt. Esser knowingly or deliberately failed to turn a prisoner's water on in one instance because this is what he does to disfavored prisoners, so it was more likely that he knowingly or deliberately failed to turn on Jackson's water. Thus, the court's exclusion of this evidence is consistent with *Gomez*.

B

Next, Jackson argues that the district court wrongly excluded evidence that Lt. Esser had used racist language against him because he failed to supplement his deposition testimony under Federal Rule of Civil Procedure 26(e). But that was not the basis on which the court excluded it. The district court raised concerns that this evidence would result in a "sideshow" because Jackson never raised a claim based on racial discrimination. It also found that the delayed attempt to introduce race into the case would be unfairly prejudicial. These concerns are consistent with the risks noted in Federal

Rule of Evidence 403. And in evaluating the district court's balancing of probative value and prejudice under Rule 403—a highly discretionary assessment—we accord the court's decision substantial deference and upset it only "if no reasonable person could agree with the ruling." *Lange v. City of Oconto*, 28 F.4th 825, 845 (7th Cir. 2022) (quotation omitted).

The court did not abuse its discretion. The degree of permissible prejudice varies with the probative value of the evidence. *Id.* at 844. And the probative value of this evidence was low. Neither Jackson's class-of-one nor deliberate indifference claims required that he show racial animus. *Johnson*, 5 F.4th at 824 (deliberate indifference); *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 588 (7th Cir. 2021) (class-of-one). At most, this evidence was relevant to his class-of-one claim because it could help demonstrate "hostile intent or animus," which can support such a claim. *Brunson v. Murray*, 843 F.3d 698, 706 (7th Cir. 2016). But probative value, unlike relevance, "may be calculated by comparing evidentiary alternatives." *Old Chief v. United States*, 519 U.S. 172, 184 (1997). Here, there was ample evidence of hostile intent in the record: numerous past disputes between Jackson and Lt. Esser. That evidence, unlike the evidence of racist language, was not unfairly prejudicial. It did not have "an undue tendency to suggest decision on an improper basis" like "an emotional one." *Lange*, 28 F.4th at 844 (quotation omitted). Because none of the claims depended on racial animus, there was a not insignificant risk that evidence of such animus would mislead the jury and confuse the issues.

C

Finally, as to the evidence that Jackson had engaged in hunger strikes while at the WSPF, we need not decide

whether the court erred by admitting it because any such error was harmless. Fed. R. Civ. P. 61. An error is harmless unless it "likely had a substantial effect on the jury's verdict and the result was inconsistent with substantial justice." *Jordan v. Binns*, 712 F.3d 1123, 1137 (7th Cir. 2013). "As a general rule, errors in admitting evidence that is merely cumulative of properly admitted evidence are harmless." *Id.* at 1138 (collecting cases).

Lt. Esser introduced the hunger-strike evidence to show that Jackson intentionally both went without water and failed to complain to create the basis for a suit. Given the bevy of rightly admitted evidence introduced for this same purpose, any error in admitting it was harmless. First, Dr. Hoem testified how inmates would threaten suicide, thereby forcing the WSPF to put them on observation status, in order to get things they wanted. She intimated that Jackson warned her that he was planning to do just that. Second, Dr. Hoem also described how, even though it had no running water, Jackson refused to leave his cell on May 24, implying he stayed there willingly. Third, multiple witnesses stated that Jackson never notified them he was without water. Fourth, Nurse Edge noted that Jackson declined medical examination and testing she offered to provide despite documentary evidence that he had filed requests for such testing, suggesting that he was manufacturing a basis for a medical care deliberate indifference claim. Finally, Lt. Esser introduced evidence and testified that Jackson, immediately after his water was turned on, was yelling about how he would have a lawsuit, indicating Jackson's motive for going without water.

V

Finally, Jackson asks us to set aside the jury verdict because the evidence at trial was insufficient to support it. But we cannot opine on this issue. Jackson did not move for judgment as a matter of law or for a new trial under Federal Rule of Civil Procedure 50 before the verdict or renew any such motion after the verdict. And a "failure to file a pre-judgment motion under Rule 50(a) prevents this court from reviewing the sufficiency of a jury verdict." *Maher v. City of Chicago*, 547 F.3d 817, 824 (7th Cir. 2008). Jackson's failure to file a post-verdict Rule 50(b) motion doubly dooms his challenge—without such a motion, we lack the power to review a challenge to the sufficiency of the evidence supporting a jury verdict in a civil case. *Collins v. Lochard*, 792 F.3d 828, 831 (7th Cir. 2015).

AFFIRMED IN PART AND REVERSED IN PART