In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 24-2898

JARYAN GILLS,

*Plaintiff-Appellant,*

*v.*

ROBERT HAMILTON, *et al.*,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Central District of Illinois
No. 4:21-cv-4011 — **Colleen R. Lawless**, *Judge.*

———————————

ARGUED SEPTEMBER 11, 2025 — DECIDED JANUARY 15, 2026

———————————

Before BRENNAN, *Chief Judge*, and KIRSCH and JACKSON-AKIWUMI, *Circuit Judges.*

KIRSCH, *Circuit Judge.* Jaryan Gills alleges that he was forced to live in wretched conditions without a sink or toilet at the East Moline Correctional Center after being assaulted by another inmate (resulting in a broken arm, among other injuries). He further alleges that several guards wouldn't let him use the bathroom for long stretches and that medical care was often delayed or substandard. He sued the prison's

doctor along with other officials under 42 U.S.C. § 1983, alleging that they violated the Eighth Amendment based on his cell conditions and medical treatment. The district court granted defendants' motions for summary judgment. Because Gills cannot show that defendants acted unreasonably given what they knew, we affirm.

I

While the events that follow are contested, we recite the facts in the light most favorable to Jaryan Gills, as we must at the summary judgment stage. *Torres v. Madrid*, 592 U.S. 306, 309 (2021). In February 2020, Gills was in the common area at the East Moline Correctional Center (EMCC) when another inmate punched him in the face and broke his arm. He was taken by ambulance to the emergency room and over the next week underwent two operations—surgeons replaced part of Gills's elbow, repaired a ligament, and inserted pins to stabilize the joint. A week after the assault, an EMCC committee concluded that Gills should be disciplined, and sentenced him to a month in segregated confinement. The Illinois Department of Corrections eventually recommended—in response to Gills's grievance filing—that the disciplinary report be expunged because it was not substantiated.

When he returned to the prison and for the next 31 days, Gills was housed in a medical segregation cell inside of the EMCC's healthcare unit. The cell didn't have a sink, toilet, or other source of running water, and Gills was locked inside. He depended on prison staff to let him go to the bathroom. Only certain officers were authorized to escort inmates, and they were supposed to make the rounds every 30 minutes. As a stopgap, Gills was also given portable urinals and waste bags to use in his cell if necessary.

Gills had trouble accessing the bathroom and sometimes couldn't wait for guards to let him out. When guards refused to allow him out or didn't arrive in time, Gills occasionally had to relieve himself in his cell. There were other problems, too. One of Gills's surgeons told him to keep his arm elevated and apply ice, but Gills wasn't regularly given ice and the cell's limited furnishings made it difficult to keep his arm elevated. Additionally, a nurse delayed giving him medication and he was only able to shower a handful of times.

Dr. William Rankin was the Medical Director at EMCC while Gills was recovering from his surgeries. When Gills wanted a pad for his sling, Dr. Rankin ordered one, but it took months to arrive. Similarly, Gills didn't receive adequate physical therapy in the aftermath of his surgeries even though Dr. Rankin ordered the sessions. While hardware in Gills's arm was supposed to be removed within three months of surgery, it was still there a year later. Gills also complained about other health issues—headaches, heartburn, and bloody stools—but neither Dr. Rankin nor other prison staff treated those conditions or did so more slowly than Gills wanted.

Gills filed this § 1983 action against Dr. Rankin and other prison officials, asserting Eighth Amendment claims based on his cell conditions and medical treatment, a related conspiracy claim, and (under Illinois law) intentional infliction of emotional distress. The parties filed cross-motions for summary judgment. Gills attempted to contest many of defendants' asserted facts by pointing to declarations in which he swore to the accuracy of allegations previously made in his complaint—in many places the declarations and the complaint are nearly identical. His attorney repeatedly cited the declarations to show disputes of fact, largely ignoring a

substantial discovery record. The district court did not consider the declarations and granted summary judgment to defendants. Gills now appeals as to his federal claims.

## II

Gills challenges the district court's decision to disregard his declarations and its ruling on the merits. We review evidentiary rulings for an abuse of discretion, *United States v. Trudeau*, 812 F.3d 578, 590 (7th Cir. 2016), and apply de novo review to a district court's ruling on cross-motions for summary judgment. *Cent. States, Se. and Sw. Areas Pension Fund v. Univar Sols. USA Inc.*, 148 F.4th 426, 429 (7th Cir. 2025). The usual standards for summary judgment apply, and because we need only consider defendants' motions against Gills, we give him the benefit of conflicting evidence and reasonable inferences. *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 873 (7th Cir. 2025). Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party who fails to produce evidence sufficient to show an element essential to his case on which he bears the burden cannot survive a summary judgment motion. *Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022).

## A

Federal Rule of Civil Procedure 56 authorizes the use of affidavits or declarations at summary judgment, but both the rule and our case law impose limits on what is acceptable. For instance, we generally do not allow litigants to make an end-run on discovery by reaching back to verify allegations in a complaint. *James v. Hale*, 959 F.3d 307, 314–15 (7th Cir. 2020).

Applying this principle, the district court ignored Gills's declarations and deemed defendants' versions of the facts admitted.

We need not decide whether the district court was right to exclude Gills's declarations based on improper complaint verification. Instead, we affirm the district court's evidentiary ruling because the declarations violated the sham affidavit rule, which "prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *Clacks v. Kwik Trip, Inc.*, 108 F.4th 950, 956 (7th Cir. 2024) (citation modified). While the rule must be applied with "great care," we have also approved the exclusion of affidavits that aren't directly contradictory but "add new factual details not previously disclosed in deposition testimony when those details seek to undo the effects of the prior testimony and manufacture a dispute to get past summary judgment." *Id.* (citation modified).

Gills's declarations add significant new factual details. For instance, one of the declarations says that for two days straight guards regularly refused to take Gills to the bathroom. But at his deposition, Gills never said he was denied access to the bathroom for more than one guard shift (eight hours) at a time. Similarly, Gills testified that he threw up once due to heartburn. His declaration, however, says that he threw up "at least fifteen times" because of that condition. In a third example, Gills swore in his declaration that a guard refused him access to drinking water for almost 12 hours. His deposition testimony makes no mention of that incident at all. These aren't isolated examples. The declarations add names, dates, and factual details absent from the deposition testimony to create disputes and survive summary judgment.

Which guards denied Gills access to facilities, when those denials occurred, and Gills's medical condition and complaints would be the focal points in any subsequent trial. Given these inconsistencies and additional details, the district court did not abuse its discretion in setting Gills's declarations aside.

Gills complains about another evidentiary matter: the district court ignored two other declarations—statements from Gills's mother and a porter at the prison. The district court did not expressly exclude these declarations, yet neither did it address this evidence. The porter confirmed some of Gills's worst experiences in the isolation cell and Gills's mother said that she could not reach her son for weeks during his recovery. This evidence is insufficient to create a genuine issue of material fact for trial. As Gills acknowledges, these statements merely corroborate the other evidence in the record, and do not differ significantly in substance from his deposition testimony. The district court's failure to address these declarations was harmless. While this evidence should have been considered, its addition to the record changes nothing.

B

Turning to conditions of confinement, Gills argues that his month-long imprisonment in a cell without a toilet or sink broke the law. The Constitution mandates humane prisons, but not comfortable ones. *Rhodes v. Chapman*, 452 U.S. 337, 349–52 (1981). Prison officials violate the Eighth Amendment through inhumane confinement when (1) conditions are, from an objective standpoint, sufficiently serious to result in the denial of the minimal civilized measure of life's necessities and (2) officials are deliberately indifferent to the situation— meaning that they know of and disregard an excessive risk of

harm to the inmate. See *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Thomas v. Blackard*, 2 F.4th 716, 719–20 (7th Cir. 2021).

Considering the first requirement—sufficiently serious conditions—Gills's experience may satisfy this standard, but not for the reason he presses. That the medical isolation cell lacked a toilet or sink was not, on its own, a denial of Gills's right to basic necessities. See *Farmer*, 511 U.S. at 847 (officials who take reasonable measures to abate inhumane conditions of confinement cannot be held liable); *Thomas*, 2 F.4th at 721 (a lack of hot water in a cell wasn't a violation of the Eighth Amendment when prison officials provided a prisoner with three hot showers per week); *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 669–71 (7th Cir. 2012) (a prisoner wasn't deprived of basic necessities when his access to showers and toilets outside of his cell was made more difficult by weekly limits placed on their use and the lack of grab bars). Prisons must have "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities," *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019) (citation modified), but we have never said that officials can only satisfy that standard by locating toilets and sinks within each cell. See, e.g., *Jaros*, 2 F.4th at 670–71; *Thomas*, 2 F.4th at 721. That an Illinois regulation mandated such facilities doesn't change the analysis. See Ill. Admin. Code tit. 20, § 504.620(b); *Williams v. Shah*, 972 F.3d 476, 479 n.1 (7th Cir. 2019) ("[S]ection 1983 protects plaintiffs from constitutional violations, not violations of state law or departmental regulations.").

Make no mistake, though: forcing a prisoner to live in egregiously unsanitary conditions satisfies the objective prong of the deliberate indifference test. See *Taylor v. Riojas*, 592 U.S. 7, 7–10 (2020) (per curiam); *Vinning-El v. Long*, 482

F.3d 923, 924–25 (7th Cir. 2007); *Thomas*, 2 F.4th at 720–21. Considering the facts in the light most favorable to Gills, he was intermittently denied the use of a toilet or sink—on multiple occasions for approximately eight hours—and at times had to improvise in his cell. There's evidence that Gills's cell was cleaned after these incidents, but the record shows that he was forced to live alongside his waste for long stretches and had no way of cleaning himself. While debatable given the intermittent nature of Gills's experience, we can assume without deciding that these cell conditions deprived Gills of the minimal civilized measure of life's necessities.

That's not the end of the inquiry, however. Gills must also demonstrate that officials were subjectively aware of his situation and refused to take reasonable measures to mitigate it. *Farmer*, 511 U.S. at 837. Gills argues that because prison officials knew his cell lacked a sink or toilet, they were deliberately indifferent to inhumane conditions of confinement that posed an excessive risk to his health. But as we've explained, the cell's lack of these facilities was not, standing on its own, a sufficiently serious condition under the Eighth Amendment. At most, the evidence shows that some guards knew that Gills was unable to access the bathroom or wash his hands for an entire shift. But the record also shows that officers took steps to mitigate the situation. Gills was given a portable urinal, his cell was cleaned, and Gills never said that he was barred from using the facilities for longer than a single guard shift at a time. While the EMCC's guards may not have acted kindly towards Gills, on this record, no reasonable jury could conclude that they responded to his plight with deliberate indifference.

## C

We turn next to Gills's claim based on insufficient medical care. The Eighth Amendment requires prisons to provide adequate medical care to those in custody. *Jackson v. Esser*, 105 F.4th 948, 961 (7th Cir. 2024). Officials fail to meet this standard if they are deliberately indifferent towards a prisoner's objectively serious medical need. *Id.* To show that defendants violated his rights in this way, Gills must prove (1) he suffered from an objectively serious medical condition and (2) defendants were deliberately indifferent to that condition. *Id.* Officials are deliberately indifferent if they know of and disregard "an excessive risk to inmate health or safety" or are "both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and they actually "draw[] the inference." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (citation modified).

Gills brought this claim against Dr. Rankin, an EMCC nurse, and various other prison officials. He argues that defendants exposed him to a risk of infection based on his broken arm by imprisoning him in a cell without a sink or toilet, refusing to take him for showers, and denying him a toothbrush, soap, or pain medication. Assuming that a broken arm is an objectively serious medical condition, see *Vance v. Peters*, 97 F.3d 987, 992–94 (7th Cir. 1996), Gills fails to explain how any defendant other than Dr. Rankin was deliberately indifferent, or why the EMCC officials without medical training weren't permitted to defer to the prison's medical staff. See *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019). By failing to press this argument, Gills forfeited his Eighth Amendment medical care claim against defendants other than Dr. Rankin.

See Fed. R. App. P. 28(a)(8)(A); *Mwangangi v. Nielsen*, 48 F.4th 816, 832 (7th Cir. 2022).

Gills has five main theories (and a few undeveloped arguments) about how Dr. Rankin was deliberately indifferent to his broken arm. Three of these are based on delayed care for "non-life-threatening but painful conditions," which means Gills must prove that the "delay exacerbated the injury or unnecessarily prolonged" his pain. *Mitchell v. Kallas*, 895 F.3d 492, 500 (7th Cir. 2018) (citation modified). Dr. Rankin also can only be held liable for delays he caused, either through action or inaction. See *Aguilar v. Gaston-Camara*, 861 F.3d 626, 630 (7th Cir. 2017) (observing that § 1983 liability requires a showing that each defendant, through his own actions, violated the Constitution); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964–66 (7th Cir. 2019) (declining to hold a doctor responsible for delays when he did not have "control over the circumstances that caused the delays").

As to delayed care, Gills first argues that Dr. Rankin was deliberately indifferent because hardware was supposed to remain in Gills's arm for two to three months but was still there well past that point due to limited follow up. But Gills does not point to any evidence that Dr. Rankin knew the hardware should have come out sooner or failed to act once Gills reported pain. Gills's second theory is based on his failure to receive timely physical therapy. But the record shows that Dr. Rankin ordered the sessions, and he cannot be held responsible for delays caused by others (or in this case, by a pandemic). See *Walker*, 940 F.3d at 966. Third, Gills argues that Dr. Rankin violated his rights by failing to promptly secure a pad for his arm sling. Yet Dr. Rankin repeatedly asked nursing staff to find padding for Gills, and Gills does not point to

evidence that the delay is attributable to Dr. Rankin (and not to other prison staff). Perhaps Dr. Rankin could have done more to follow up in some places, but deliberate indifference requires much more. *Jackson*, 105 F.4th at 961.

Gills's other arguments (which aren't based on delayed care) also fail. His fourth theory is that Dr. Rankin was deliberately indifferent because a specialist told Gills to keep ice on his arm while he was recovering from surgery, yet prison officials didn't provide adequate ice. Dr. Rankin can't be held liable on this basis because again Gills cites no evidence that Dr. Rankin knew about the specialist's instruction. Fifth, Gills argues that Dr. Rankin violated his rights because he knew the isolation cell lacked a sink and toilet, but Gills fails to show that Dr. Rankin was aware that he was struggling to access those facilities outside his cell, or (as a result) that Gills faced a substantial risk of infection.

Finally, Gills contends that Dr. Rankin was deliberately indifferent to other conditions—including headaches, heartburn, and bloody stool. Even assuming without deciding that these conditions qualify as objectively serious, the record shows that Dr. Rankin pursued a reasonable course of treatment, and he cannot be faulted for delays caused by others. Gills's medical care while recovering from surgery may not have been everything he wanted (or everything that his surgeon recommended). But the evidence shows that Dr. Rankin performed his role at a level far above the Eighth Amendment's standard for liability.

## D

Finally, Gills argues that there's a material dispute as to whether defendants conspired to violate his Eighth

Amendment rights. Gills cannot show that defendants violated his constitutional rights, and so this claim fails based on the absence of an underlying violation. See *Archer v. Chrisholm*, 870 F.3d 603, 620 (7th Cir. 2017). Even if Gills could make such a showing, there's no non-speculative evidence that defendants reached an agreement to violate his rights. *Beaman v. Freesmeyer*, 776 F.3d 500, 510–11 (7th Cir. 2015). Conspiracies are often carried out secretly, which can make finding direct evidence challenging. *Id.* at 511. Circumstantial evidence is acceptable, yet it must be more than speculative. *Id.* Here, the best that Gills can do is speculate. Among other things, Gills says a conspiracy existed because defendants knew about his cell's lack of facilities, there were flaws in the investigation into his assault, his family wasn't allowed to visit him, and there was a change in the prison's shower policy. But Gills cannot show that defendants agreed to take any action against him. Summary judgment was appropriate on the conspiracy claim.

AFFIRMED