In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 23-2093, 23-2102 & 23-2284

JUANITA ARRINGTON, MICHAEL COKES,
and ISIAH STEVENSON,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO and DEAN W. EWING,

*Defendants-Appellees*.

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 1:17-cv-05345 & 1:17-cv-04839 — **Thomas M. Durkin**, *Judge*.

———————————

ARGUED SEPTEMBER 13, 2024 — DECIDED AUGUST 1, 2025

———————————

Before EASTERBROOK, JACKSON-AKIWUMI, and KOLAR,
*Circuit Judges*.

JACKSON-AKIWUMI, *Circuit Judge*. On July 1, 2016, in a suburban shopping center parking lot, Michael Cokes, Isaiah Stevenson, and Ronald Arrington waited in a Pontiac for their fellow passenger, Jimmie Malone. While they waited, Malone robbed a restaurant manager. When Malone returned to the car with the spoils of that robbery, the three men drove him

away from the scene, pulled over on the side of a road, and let him take over as the driver. Later, when Illinois state troopers stopped the car, the men refused orders to exit. Instead, they again stuck with Malone, who sped off.

The state troopers pursued the car. During the chase, Malone floored it sixty miles per hour northbound down a southbound-only residential road. Hoping to assist in the pursuit, Chicago Police Department Officer Dean Ewing drove his unmarked Ford Explorer fifty-five miles per hour eastbound on an intersecting street. Tragically, the cars collided at the intersection. Ewing's Ford broadsided and flipped the Pontiac. The impact seriously injured Cokes, Stevenson, and all four officers in Ewing's Ford. It killed Malone and Arrington.

Cokes, Stevenson, and Juanita Arrington (as the administrator of Ronald Arrington's estate) eventually sued the City of Chicago and Officer Ewing, alleging a variety of torts related to the collision. Following a nine-day trial, a jury found in the defendants' favor on all claims. After unsuccessfully moving for a new trial, the plaintiffs brought these consolidated appeals challenging the district court's decisions on affirmative defenses, jury instructions, and the admissibility of evidence. For the reasons discussed below, we conclude that the district court did not commit legal error or abuse its discretion. We affirm.

**I**

**A. Pre-Chase Developments**

The morning of the deadly collision, Cokes and Stevenson later recounted at trial, Arrington and Malone picked them up in a gold Pontiac that belonged to Malone's girlfriend.

Arrington was driving at the time. He picked up Cokes first and then Stevenson, who had asked for a ride to visit his children. On the way there, Malone directed Arrington to stop the car at a Tinley Park, Illinois, shopping center.

A witness testified that Arrington circled the center's parking lot twice before parking. Malone then got out and told Arrington he had to "take care of some business." The same witness testified, as did Cokes, that Malone chased a woman, grabbed her by the back of her jacket, and then ran in the opposite direction.

As Malone hurried back to the Pontiac, Arrington reversed out of the parking space with the passenger door still open. Arrington then drove away, and the other occupants began "bickering" with Malone. As a result of the bickering, Arrington eventually pulled over, refused to drive any farther, and told Malone: "[Y]ou can drive your own car." Malone, who Stevenson testified was known as a "getaway driver," switched seats and resumed the escape.

While Malone drove away, the woman he robbed spoke with police. She told them that he had taken a bank bag containing $1,300, and she provided a description of the vehicle: a gold Pontiac with tinted windows and no license plate. A car matching that description then passed Illinois State Police Troopers Brian Walker and Charles Dixon, who in their separate squad cars had received a report of a robbery over the Illinois State Police Emergency Radio Network. Both Walker and Dixon followed the Pontiac to an exit ramp where Walker activated his lights and siren. The Pontiac briefly came to a stop at that point. As Walker and Dixon approached the Pontiac, they repeatedly yelled for the occupants to exit the car. But nobody heeded the commands.

### B. Police Chase and Collision

Within about twenty seconds of stopping, Malone sped away. Walker gave chase. As he followed Malone, Walker reported his location to the state police emergency radio dispatchers at frequent intervals. He also asked for Chicago Police Department (CPD) assistance.

When asked to describe Malone's driving, Stevenson testified that Malone fled away "[c]razy as hell, driving wild and reckless." Walker testified that Malone drove erratically, through red lights, into oncoming taffic, and at speeds exceeding seventy-five miles per hour through dense residential areas. During the chase, the Pontiac entered an alley and its left rear passenger door—where Arrington was seated—opened briefly, and someone may have attempted to exit the car.

CPD Officer Ewing, who was on patrol in an unmarked Ford Explorer carrying three other officers, received an alert from the Office of Emergency Management Communications (OEMC) about "a pursuit at 123rd [Street] and Halsted [Street]" involving a gold Pontiac wanted for armed robbery. Based on his experience, Ewing suspected that the pursuing state trooper was alone. So, to assist that trooper with his pursuit, Ewing drove four blocks from South 119th Street and Halsted Street to the reported area. He did so without obtaining supervisory approval to engage in an interjurisdictional pursuit as required under CPD general orders.

Since the Illinois State Police and CPD use different radio networks, Ewing could not hear Walker's location call-outs in real time. OEMC provided multiple delayed updates to Ewing and the officers with him. Based on those OEMC call-

outs, Ewing believed that the Pontiac was headed eastbound down West 125th Street from South Union Avenue, which would have meant the car was southeast of him and about five blocks away. With that location in mind, Ewing accelerated to "catch up with [the Pontiac]."

Ewing activated his emergency lights. Disregarding a stop sign, he entered the intersection of West 124th Street and South Union Avenue with his foot still pressing on the accelerator. Relying on a review of the squad car's black box (the Event Data Recorder), a crash reconstruction expert, Adam Hyde, testified about Ewing's driving leading up to the crash. Hyde testified that Ewing briefly pressed his brake pedal one-and-a-half seconds before the crash, pressed his accelerator 52.2% one second before the crash, steered milliseconds before the crash, and firmly pressed the brake pedal two-tenths of a second before the crash—about fourteen feet from impact. Hyde testified that Ewing moved the steering wheel "to the right slightly, and then ... move[d] back to the straight-ahead position." Hyde also testified that, before Ewing took his foot off the gas and braked briefly, he approached the intersection at full throttle ("pedal to the metal").

Meanwhile, Malone was himself traveling full throttle at approximately sixty miles per hour northbound on South Union Avenue, a one-way-southbound street with a speed limit of thirty miles per hour. Dr. Jeremy Bauer, a forensic biomechanics and accident reconstruction expert, testified that Malone never once pressed the brake pedal in the five seconds before impact. Ewing testified that, as he entered the intersection, he "saw a flash" and "tried to stop." He testified that the Pontiac entered his field of vision less than one second before the impact.

## C. Post-Collision Developments

Malone and Arrington did not survive the collision. Cokes and Stevenson did, but they sustained injuries and were arrested and charged with felony robbery. Of the $1,300 that was stolen by Malone, $800 was recovered from Malone's person and $200 was recovered from Cokes's clothing. Stevenson and Cokes both later pleaded guilty to misdemeanor theft in connection with the incident.

The Civilian Office of Police Accountability (COPA), Chicago's independent agency that reviews police conduct, investigated the incident. That investigation culminated in a twenty-nine-page report recommending that Ewing receive two ninety-day suspensions for speeding and disregarding a stop sign. The report concluded that "Ewing's lack of due care and due regard when operating his vehicle" was one of three causes of the crash, along with Malone's traffic violations and the "problematic and delayed" radio communications. As for Ewing's conduct specifically, the report found that Ewing violated CPD policies and Illinois law by operating his squad car without due regard for the safety of other traffic.

## D. District Court Proceedings

Cokes, Stevenson, and Arrington's estate sued the City of Chicago and Officer Ewing in the Circuit Court of Cook County. They brought the following claims: excessive use of force in violation of the Fourth Amendment under 42 U.S.C. § 1983; civil battery; willful and wanton conduct; willful and wanton negligence; indemnification; respondeat superior; and a claim under *Monell v. New York Department of Social Services*, 436 U.S 658 (1978). The defendants then removed the case to federal court.

Once in federal court, the plaintiffs amended their complaints, and the defendants submitted amended answers, which included affirmative defenses. The plaintiffs moved to strike those affirmative defenses as untimely. The district court denied that motion without prejudice but allowed for limited discovery on the contested issues. The parties subsequently filed cross-motions for summary judgment. The court denied the defendants' motion. It also denied the plaintiffs' motion for partial summary judgment as to three of the defendants' affirmative defenses: failure to mitigate damages; joint enterprise; and failure to control driver or take precautions. But it granted summary judgment to the plaintiffs as to several of the defendants' affirmative defenses, including the defense of unavoidable collision. Lastly, the plaintiffs filed motions in limine, including (1) a motion to admit the COPA report and (2) a motion to bar testimony by Stevenson and Cokes about Arrington's conduct and conversations leading up to the crash pursuant to the Illinois Dead Man's Act. The district court denied both motions in limine but allowed for the introduction of the COPA report if Ewing were to "open the door via his own volunteered testimony or testimony he elicits from others." *Arrington v. City of Chicago*, No. 1:17-cv-05345, Order, Dkt. 286 at *5 (N.D. Ill. Aug. 8, 2022).

With those evidentiary issues settled, trial commenced on the plaintiffs' claims against Ewing for excessive force, battery, willful and wanton conduct, and negligence. (The City of Chicago was not listed on the jury verdict forms because it stipulated before trial that Ewing was acting within the scope of his authority, so it would pay any compensatory damages.) While testifying at trial, Ewing vaguely referenced a nonexistent ruling that his crash was unavoidable. The plaintiffs argued that this opened the door to introduction of the COPA

report. The district court overruled those objections but admonished Ewing and struck some of Ewing's testimony. At the conclusion of trial, the jury ruled in the defendants' favor on all counts. Nevertheless, as noted in the special verdict forms, the jury rejected the defendants' joint enterprise theory of imputed negligence that, if proven, would have meant that any contributory fault attributed to Malone would be attributed to the plaintiffs as well. *See Grubb v. Ill. Terminal Co.*, 8 N.E.2d 934, 938–39 (Ill. 1937) ("[W]hen two or more persons are engaged in a joint enterprise or undertaking in the use of an automobile, the contributory negligence of one will bar recovery by either, where the claimed damage arises out of a matter within the scope of a joint undertaking….").

After trial, the plaintiffs moved for a new trial under Federal Rule of Civil Procedure 59. They argued, in relevant part, that the district court erred with three decisions: (1) allowing the defendants to pursue a joint enterprise theory of imputed negligence; (2) concluding that the Illinois Dead Man's Act did not govern this case and allowing questioning and testimony as to Arrington's conduct and communications; and (3) precluding the plaintiffs from introducing the COPA report. The court denied those motions.

Now on appeal, the plaintiffs challenge the district court's denial of their motions for a new trial. When ruling on their post-trial motions, the district court restated the reasons for its rulings before and during trial, and defended its decisions about the three issues identified above. With the first two issues—allowing the joint enterprise defense and deeming the Illinois Dead Man's Act inapplicable—the court reasoned that any error would have been harmless considering the evidence and the jury's findings. As for the third issue—

barring the COPA report—the district court added that Ewing had not opened the door to the report's introduction and the court had cured any "minimal prejudice" from Ewing's statements by striking his testimony, admonishing him, and offering limiting instructions.

In Part II below, we evaluate the district court's decision on the joint enterprise defense. In Part III, we examine the court's evidentiary decisions on the Illinois Dead Man's Act and the COPA report.

## II

The plaintiffs raise two related but distinct challenges to the district court's decision allowing the defendants to introduce a joint enterprise theory of contributory negligence at trial. First, they argue that the district court abused its discretion in allowing the defendants to plead the theory late, thereby limiting discovery on the issue. Second, they argue it was legal error for the court to permit the defendants to plead the theory at all under Illinois law.

"We review for abuse of discretion a district court's discretionary decision to allow late assertion of an affirmative defense but review de novo the underlying legal issues." *Burton v. Ghosh*, 961 F.3d 960, 964 (7th Cir. 2020) (citations omitted). When reviewing the district court's decision to deny plaintiffs' motion for judgment as a matter of law as to the joint enterprise defense theory, we construe the facts in favor of the defendants. *Whitehead v. Bond*, 680 F.3d 919, 925 (7th Cir. 2012) ("Because the defendants prevailed at trial, we construe the facts strictly in their favor.").

## A. Timing of the Joint Enterprise Theory

The plaintiffs argue that the defense was untimely raised but their argument is waived. Here is what happened: when the plaintiffs moved to strike the defense, the district court, rather than granting the motion, gave the plaintiffs an extra thirty days of discovery into the issues raised by the defense. The court also set a status conference for the conclusion of that added discovery period to address whether the remedy was adequate. The plaintiffs did not object to the amount of added time or request a further extension. Yet, they now argue for the first time on appeal that the added discovery time was a "woefully inadequate" remedy. That argument is untimely. *Lane v. Structural Iron Workers Loc. No. 1 Pension Tr. Fund*, 74 F.4th 445, 450 (7th Cir. 2023) ("It is a cardinal rule of appellate practice that we ignore arguments not presented below."). Thus, regardless of any merit, we cannot reach this timing argument.

## B. Pleading the Joint Enterprise Theory

In addition to their timing argument, the plaintiffs contend that the district court erred as a matter of law in allowing the defendants to plead as an affirmative defense a joint enterprise theory of contributory negligence. The plaintiffs' argument has two parts. First, they argue that Illinois state law precludes application of the theory to cases like this one. Second, they argue that there was insufficient evidence to plead the theory. For the reasons below, both contentions are unavailing.

### 1. The theory's application to criminal ventures

As an initial matter, Cokes and Stevenson argue that the district court erred by expanding the joint enterprise theory

of contributory negligence beyond the bounds delimited by Illinois courts. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (requiring federal courts to apply state substantive law in certain circumstances). At issue here is the district court's jury instructions which set forth the joint enterprise theory's elements as follows:

> One of the issues to be decided by you is whether Ronald Arrington, Isiah Stevenson, Michael Cokes and Jimmie Malone were engaged in a joint enterprise. A joint enterprise exists if these four elements are present:
>
>> (1) An agreement, express or implied, between Ronald Arrington, Isiah Stevenson, Michael Cokes and Jimmie Malone; and
>>
>> (2) A common purpose to be carried out by Ronald Arrington, Isiah Stevenson, Michael Cokes and Jimmie Malone; and
>>
>> (3) A mutual profit-seeking endeavor for that purpose between Ronald Arrington, Isiah Stevenson, Michael Cokes and Jimmie Malone; and
>>
>> (4) An understanding between them that each had a right to share in the control of the operation of the car.
>
> As to the third element, the mutual profit-seeking endeavor need not be a lawful endeavor.
>
> As to the fourth element, the question for you to decide is whether there was a right in each to

> share the control of the operation of the car ra-
> ther than the actual exercise of the right.

As revealed by its answers to the special verdict questions, the jury found that the plaintiffs had a "common purpose" but were not engaged in a joint enterprise because they did not have a "mutual profit-seeking endeavor" and did not have "an understanding between them that each had a right to share in the control of the operation of the Pontiac Grand Prix."

Relying on Illinois state caselaw and pattern jury instructions, Cokes and Stevenson argue that Illinois courts have limited the application of this theory and have required those raising it to prove that the supposed joint venturers had an agreement to carry out a legally legitimate business enterprise. They cite, for example, the Illinois Pattern Jury Instructions, which provide the elements of a joint enterprise theory of imputed negligence as follows:

> A joint enterprise exists if these four elements
> are present:
>
>> (1) An agreement, express or implied, be-
>> tween _____ and _____; and
>>
>> (2) A common purpose to be carried out by
>> _____ and _____; and
>>
>> (3) A common business interest in that pur-
>> pose between _____ and _____; and
>>
>> (4) An understanding between them that
>> each had a right to share in the control of the
>> operation of the car.

> As to the fourth element, the question for you to decide is whether there was a right in each to share the control of the operation of the car rather than the actual exercise of the right.

Ill. Pattern Civil Jury Instructions, § 72.04. In light of those authorities, the plaintiffs argue that the district court erred by substituting the requirement for a "common business interest" (what the plaintiffs refer to as the "legitimate purpose" element), with an instruction requiring a "mutual-profit seeking endeavor."

The problem with this argument is that there is no Illinois caselaw or statutory authority expressly limiting the joint enterprise theory to legitimate business ventures. Aptly stated by the district court, "[T]he case law does not clearly foreclose application of the joint enterprise rule to an alleged criminal enterprise." *Arrington v. City of Chicago*, No. 1:17-cv-05345, 2022 WL 3357272, at *3 (N.D. Ill. Aug. 15, 2022). Acknowledging the frequent use of terms like "business enterprise" or "common business purpose" by Illinois state courts, the district court properly reasoned that such language is meant to distinguish a "true joint enterprise" from "one in which the vehicle occupants are sharing a car as a matter of convenience or because they are simply going to the same place." *Id.* at *3 (discussing cases). In support of that interpretation, the district court noted that "historical applications of the rule [in Illinois] … show that it does not require the level of formality that the term 'business' might suggest." *Id.* (citing *Grubb*, 8 N.E.2d at 938–39 (finding a joint enterprise where sisters agreed to travel together to buy home decorations)).

As for the Illinois pattern jury instruction, cited by Cokes and Stevenson, two points are worth noting. First, although a

"helpful starting point," pattern jury instructions are not necessarily binding. *United States v. Edwards*, 869 F.3d 490, 496–97 (7th Cir. 2017) ("Pattern instructions are not intended to be used mechanically and uncritically."); *United States v. Smith*, 109 F.4th 888, 894 (7th Cir. 2024) ("Illinois pattern jury instructions are used only when they accurately state the law." (quoting *People v. Peete*, 252 N.E.2d 689, 695 (Ill. App. Ct. 2001))). Second, the Illinois pattern jury instruction that Cokes and Stevenson rely on approvingly cites not only *Grubb*, but also the Second Restatement of Torts, which broadly defines joint enterprises and does not limit them to legal ventures. Ill. Pattern Civil Jury Instructions, § 72.04 Comment; *see also* Restatement (Second) of Torts, § 491 Comment b. ("A 'joint enterprise' is in the nature of a partnership, but is a broader and more inclusive term…. A joint enterprise includes a partnership, but it also includes *less formal arrangements* for cooperation, for a more limited period of time and a more limited purpose." (emphasis added)); *id.* Comment c. ("The elements which are essential to a joint enterprise are commonly stated to be four: … (3) a community of pecuniary interest in that purpose, among the members ….").

On appeal, Cokes and Stevenson point to intermediate Illinois appellate courts' dicta that arguably expresses unease with the liberal application of the theory in *Grubb*. But the plaintiffs have not identified any authority overruling *Grubb* or even expressly disagreeing with *Grubb* on this point. Indeed, some of the cases Cokes and Stevenson cite on this point support the district court's ruling. *See, e.g.*, *Matesevac v. County of Will*, 416 N.E.2d 807, 811 (Ill. App. Ct. 1981) (affirming jury instruction on joint enterprise where purpose of the trip was to view farmhouse for rent). Thus, plaintiffs' argument that

Illinois law precludes the application of the joint defense theory to this criminal case is uncompelling.

### 2. There was more than "a mere scintilla" of evidence of a joint enterprise

The plaintiffs' second challenge to the defendants' joint enterprise theory is that it was not supported by sufficient evidence and should not have been considered by the jury. Specifically, they argue that "the record is devoid of evidence supporting the elements of the doctrine, expanded or not." Recall, the district court properly instructed the jury that those elements are: (1) an agreement; (2) a common purpose; (3) a mutual profit-seeking endeavor for that purpose; and (4) an understanding that each had a right to share in the control of the operation of the car. So instructed, the jury rejected the theory, finding the defendants proved only the second element (common purpose).

To prevail on this argument about the sufficiency of the evidence, Cokes and Stevenson must overcome a staggeringly deferential standard. *See Filipovich v. K & R Exp. Sys., Inc.*, 391 F.3d 859, 863 (7th Cir. 2004) ("A legally sufficient amount of evidence need not be overwhelming, but it must be more than a 'mere scintilla.'" (quoting *Massey v. Blue Cross-Blue Shield of Ill.*, 266 F.3d 922, 924 (7th Cir. 2000))); *see also May v. Chrysler Group, LLC*, 716 F.3d 963, 971 (7th Cir. 2013) (observing that appellate court engages in a "highly charitable assessment of the evidence").

The district court correctly concluded that there was clearly "more than a mere scintilla" of evidence to allow the defendants to plead that theory. We agree based on the evidence the court considered, as well as other evidence before

the jury. Circumstantial as it was, the evidence included: (1) video recordings of the lead-up to the robbery showing the Pontiac possibly "stalking" the robbery victim when circling the lot twice; (2) the plaintiffs' knowledge of Malone's reputation as a "getaway driver"; (3) that Arrington reversed the car, reoriented it, and drove Malone away when Malone returned from the robbery; (4) that the plaintiffs let Malone drive the car and did not exit the car despite at least three opportunities to do so—namely, in the parking lot, on the highway before Malone took over as driver, and when Malone briefly stopped for the state troopers; (5) Cokes and Stevenson's subsequent convictions for theft in connection with the robbery; and (6) the cash recovered from Cokes' clothing. As such, the theory was supported by more than a "mere scintilla of evidence." The district court did not err in allowing the defendants to plead and submit evidence on a joint enterprise theory of imputed negligence.

For these reasons, we affirm the district court's decision to allow the defendants to plead and argue a joint enterprise theory of contributory negligence. Before proceeding, we pause to address what may be a source of confusion for the plaintiffs. One way for the jury to find that the plaintiffs were contributorily negligent was to impute Malone's negligence onto them under a joint enterprise theory. Another way to reach that same outcome, was for the jury to find that the plaintiffs failed to take precautions by, for example, letting Malone drive and not getting out of the car when they had the chance. With the exception of the COPA report's admissibility, all the issues the plaintiffs challenge on appeal go to that first avenue: the defendants' joint enterprise theory. But the jury rejected that theory and instead opted for the another avenue, which plaintiffs do not challenge on appeal: the jury may have

implicitly found that Ewing was not a proximate cause of the plaintiffs' injuries. This is one of the reasons why the plaintiffs' challenges to the joint enterprise defense cannot upend the jury verdict.

### III

We turn to the two issues the plaintiffs raise about the district court's evidentiary decisions. First, Arrington's estate argues that the Illinois Dead Man's Act should have governed the admissibility of conversations and events that occurred in Arrington's presence. Second, the plaintiffs challenge the district court's decision to bar the introduction of the COPA report.

### A.  Illinois Dead Man's Act

Subject to some exceptions, the Illinois Dead Man's Act precludes adverse parties or persons from testifying to any conversation involving the decedent or any event which took place in the presence of the decedent. *See* 735 ILCS 5/8-201. In denying the motion in limine filed by Arrington's estate, the district court concluded that the Illinois Dead Man's Act does not apply under Federal Rule of Evidence 601 because the estate's "various state claims ... all overlap with the federal claim that arises from the same crash." *Arrington*, at *2 (Aug. 15, 2022). On appeal, Arrington's estate argues that the district court erred in reaching that conclusion. We review a district court's interpretations of the rules of evidence de novo. *United States v. Hamzeh*, 986 F.3d 1048, 1052 (7th Cir. 2021).

### 1.  Rule 601 governed, not Illinois law

Federal Rule of Evidence 601 provides a default presumption of witnesses' competency to testify. *Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 570 (7th Cir.

2009). But in civil cases it also carves out from that presumption state law exceptions that "govern[] a witness's competency regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 601. "[T]he legislative history of Rule 601 reveals that the purpose of this exception was, precisely, to preserve state dead man's laws in cases ... where state law supplies the rule of decision." *Lovejoy Elecs., Inc. v. O'Berto*, 873 F.2d 1001, 1005 (7th Cir. 1989) (citing H.R. Rep. No. 650, 93d Cong., 1st Sess.9 (1973)). One such state law is, of course, the Illinois Dead Man's Act. Thus, the question presented in this appeal is whether state law supplied the "rule of decision" for purposes of Rule 601. In cases involving only state claims, the answer is easy. But, in cases involving mixed federal and state claims, the answer is not so obvious.

The Supreme Court and our court have not supplied an answer to that question, but we can gain insight from a well-reasoned district court decision on the issue. In *Donohoe v. Consolidated Operating & Production Corporation*, Judge Milton Shadur was presented with the question of whether to apply the Illinois Dead Man's Act to a federal case involving a mixture of state and federal claims. 736 F. Supp. 845, 860–61 (N.D. Ill. 1990), *rev'd on other grounds*, 982 F.2d 1130 (7th Cir. 1992). Judge Shadur began his analysis by observing that "where a federal claim is at issue[,] the Dead-Man's Act is inapplicable." *Id*. at 860 (citing *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1051 (7th Cir. 1977)). He then turned to the Senate Judiciary Committee Notes to Federal Rule of Evidence 501 (governing privileges), which similarly provides for deference to state evidentiary standards when state law supplies the rule of decision. *Id*. at 860–61. Those notes read: "If the rule proposed here results in two conflicting bodies of privilege law applying to the same piece of evidence in the same case,

it is contemplated that the rule favoring reception of the evidence should be applied." *Id*. (quoting Notes of Committee on the Judiciary, Senate Report No. 93-1277). Applying the principles from the notes on Rule 501 to Rule 601, Judge Shadur ruled that the Illinois Dead Man's Act did not govern and therefore the decedent's contested statements and activities were admissible. *Id*. at 861 ("[T]his Court finds the reasoning of the Judiciary Committee to be equally persuasive as to the issue of witness competency as it is to privilege."). That decision followed from the fact that the decedent-related testimony related to not only the plaintiff's state common law fraud claims but also the plaintiff's federal securities and racketeering claims. *Id*. at 846, 860–61.

Applying that reasoning to this case, the next question would be whether the decedent-related testimony in this case relates to both the state *and* federal claims brought by Arrington's estate. As for what "relates to" means in this context, there are two additional decisions from which we can gain insight.

First, in *Estate of Suskovich*, we concluded that Rule 601—rather than Indiana's Dead Man's Statute—applied to the competency of witnesses "insofar as the evidence relate[d] to any of the federal claims." 553 F.3d at 570 (citing approvingly *Donohoe*, 736 F. Supp. at 860–61). In that case, the plaintiff estate raised two federal law claims and one state law claim for the failure of the decedent's employer to properly classify him as an employee rather than a contractor. *Id*. The disputed testimony "related to" both the state and federal claims, and the Indiana Dead Man's Statute would have applied only to testimony that "related *solely* to the [state] common law claims." *Id*. at 561, 571 (emphasis added). The second case is *Estate of*

*Chlopek v. Jarmusz*, in which the plaintiff asserted state and federal claims against a Chicago police officer who shot and killed an individual who refused to drop a handgun. 877 F. Supp. 1189, 1190–91, 1193 (N.D. Ill. 1995) (adopting the *Donohoe* approach and concluding that the Illinois Dead Man's Act did not bar the officer's testimony because that testimony related to both the state law and federal law claims.).

Arrington's estate argues that these two decisions are inapplicable because they predate an amendment to Rule 601. But that argument is a nonstarter because the amendment was purely stylistic. *See* FED. R. EVID. 601 Committee Note on 2011 Amendment. So, we proceed to the analysis.

As in *Estate of Suskovich* and *Estate of Chlopek*, the decedent-related testimony in this case was relevant not only to the estate's state tort law claims, but also a federal claim. Specifically, the testimony related to the Arrington estate's § 1983 claim, which required evidence that the officer's conduct was the proximate cause of the estate's damages. *See Clarett v. Roberts*, 657 F.3d 664, 673 (7th Cir. 2011) (describing plaintiff's burden of proving that the officer's "use of excessive force was the *proximate cause* of [the plaintiff's] injury or harm" (emphasis added)). Of course, Arrington's conduct—aiding Malone's escape and then declining opportunities to exit the vehicle—was relevant to whether he was contributorily negligent for the ensuing accident and injuries, meaning Ewing's conduct was not the sole proximate cause. *Brownell v. Figel*, 950 F.2d 1285, 1287, 1295 (7th Cir. 1991) ("[The plaintiff's] drunken driving set in motion a chain of events, all of which were reasonably foreseeable, leading to his injury. Because the acts of [the defendants] did not proximately cause [the plaintiff's] injuries, the district court properly granted

defendants' motion for summary judgment [on the plaintiff's § 1983 excessive force claim].").

Citing our decision in *Santiago v. Lane*, Arrington's estate argues that contributory negligence is not a defense to a § 1983 claim. 894 F.2d 218 (7th Cir. 1990). But *Santiago* dealt with an Eighth Amendment deliberate indifference claim and merely held that "contributory negligence is not a defense to an allegation of intentional or reckless conduct." *Id.* at 219, 224. Here, unlike in *Santiago*, law enforcement's exertion of force at least arguably did not rise to the level of intentional or reckless conduct. Indeed, Arrington's estate itself alleged negligence and the jury found that Ewing did not intentionally cause the collision. Accordingly, evidence of contributory negligence was admissible to defend against the Arrington estate's § 1983 claim. In turn, Arrington's actions and statements were relevant to that claim. Thus, adopting the reasoning in *Donohoe*, the testimony at issue was properly admitted under Rule 601.

### 2.  Any error did not have a substantial effect

Even if we were to assume that the district court did err and the Illinois Dead Man's Act governed rather than Rule 601, reversal would still be inappropriate because any error likely did not impact the verdict. "We review evidentiary rulings for abuse of discretion. But we will not reverse unless the error likely affected the outcome of the trial." *Jackson v. Esser*, 105 F.4th 948, 963 (7th Cir. 2024) (citation omitted). "An error is harmless unless it 'likely had a substantial effect on the jury's verdict and the result was inconsistent with substantial justice.'" *Id*. at 964 (quoting *Jordan v. Binns*, 712 F.3d 1123, 1137 (7th Cir. 2013)).

We agree with the district court's observation that the admitted evidence was mostly favorable to Arrington. That evidence included testimony establishing that: (1) Arrington tried to convince Malone to surrender; (2) Arrington was unhappy with Malone's robbery and argued with him about it; (3) Arrington eventually refused to drive after the robbery; and (4) Arrington refused Malone's money when Malone tried to pass some to the backseat. Moreover, the district court barred the only disputed testimony that was unquestionably adverse to Arrington: Stevenson's post-crash statement to Trooper Walker that "[Arrington] knew what he was getting into." With that in mind, we cannot say that any error on this issue had a substantial effect on the jury's verdict.

## B. COPA Report

Federal Rule of Evidence 403 provides for the exclusion of relevant evidence if the "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. In rulings both before and during trial, the district court barred the introduction of the COPA report under Rule 403 because it found the risk of unfair prejudice, confusion of issues, and waste of time substantially outweighed the report's probative value. We generally review a district court's evidentiary rulings for abuse of discretion. *Common v. City of Chicago*, 661 F.3d 940, 946 (7th Cir. 2011). In doing so, we give special deference to a district court's Rule 403 findings, and reverse "only when no reasonable person could take the view adopted by the trial court." *Id.* (citation modified).

It is difficult for us to find an abuse of discretion here given that the plaintiffs were free to introduce all the evidence relied upon by COPA during its investigation. And, indeed, the plaintiffs did introduce much of that evidence with the help of two experts on accident reconstruction and police practices. Effectively, this means that the only information in the COPA report that was kept from the jury was COPA's legal and administrative conclusions—exactly the sort of information Rule 403 is intended to safeguard against. *Cf. Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 623–25 (7th Cir. 2003) (affirming decision to exclude EEOC findings of discrimination from evidence in jury trial); *Vance v. Peters*, 97 F.3d 987, 994–95 (7th Cir. 1996) (affirming decision to exclude report from state employee review officer concluding that correctional officer had used excessive force). Thus, we cannot say that no reasonable person would have taken the view that the district court did here.

Moving beyond the COPA report's initial admissibility, the plaintiffs also contend that Ewing's testimony opened the door to the report and called for the report's introduction as a remedial measure. To support their contention that Ewing opened the door to the report's admission, the plaintiffs point to his comments implying that he was exonerated. For example, he remarked on the witness stand that the crash was "ruled" unavoidable and the incident was "designated as a non-preventable accident." According to the plaintiffs, Ewing's statements, together with testimony from a defense expert that the expert had reviewed a COPA investigative report, invited the jury to infer that COPA had investigated the incident and cleared Ewing of wrongdoing. With this inference in mind, the plaintiffs argue that the district court's refusal to admit the report after the defense opened the door on

multiple occasions and plaintiffs objected, "compounded [the court's] initial error."

The plaintiffs' desire to share COPA's findings with the jury is imminently rational. But the district court permissibly resorted to less drastic measures given its concern that introducing the report would be an incommensurate remedy to the alleged door-opening by the defense. The more conservative measures the court chose included striking Ewing's testimony, admonishing him, and instructing the jury to disregard the inappropriate portions of his statements. Of course, when it comes to ameliorating the effect on jurors of statements like Ewing's, it is hard to put the "genie back in the bottle" or "unring the bell," so to speak. So, it is understandable that the plaintiffs wanted to correct Ewing's misstatements in a more direct and forceful manner. Yet, under the highly deferential standard of review that binds us, the plaintiffs have not shown this issue merits remand for a new trial.

## IV

Despite the shadow that the joint enterprise theory cast over the trial and the possibility that the plaintiffs suffered from guilt by association with Malone as a result, for the reasons explained above, it is hard to conclude that a new trial is warranted. *Johnson v. Gen. Bd. of Pension & Health Benefits of the United Methodist Church*, 733 F.3d 722, 730 (7th Cir. 2013) (new trial may be granted only "where the verdict is against the clear weight of the evidence or the trial was not fair to the moving party"). We see no error and no abuse of discretion in the denial of the plaintiffs' motions for a new trial. The judgment is AFFIRMED.